NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-11612


EASTHAMPTON SAVINGS BANK & others[1] vs.  CITY OF SPRINGFIELD.



Suffolk.      September 4, 2014. - December 19, 2014.

Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk, & Hines, JJ.



Constitutional Law, Home rule, Home Rule Amendment.  Municipal Corporations, Home rule, By-laws and ordinances, Fees. Mortgage, Foreclosure.  Massachusetts Oil and Hazardous Material Release Prevention Act.  State Sanitary Code.




Certification of questions of law to the Supreme Judicial Court by the United States Court of Appeals for the First Circuit.


Tani E. Sapirstein for the plaintiffs.
Thomas D. Moore, Associate City Solicitor (Lisa C. deSousa, Associate City Solicitor, with him) for the defendant.
The following submitted briefs for amici curiae:
Lee D. Goldstein for Harvard Legal Aid Bureau & others.
Robert G. Rowe, III, of the District of Columbia, for American Bankers Association, Inc.
Francis J. Nolan & Nathalie K. Salomon for Real Estate Bar Association for Massachusetts, Inc., & another.
Michael McDonagh for Massachusetts Association of Realtors.


---

[1] Chicopee Savings Bank, Hampden Bank, United Bank, Monson Savings Bank, and Country Bank for Savings.

Henry C. Luthin, First Assistant Corporation Counsel, & Brandon H. Moss for Massachusetts Municipal Lawyers Association, Inc.

William F. Sheehan, of the District of Columbia, & Brenda R. Sharton & Thomas M. Hefferon for Massachusetts Bankers Association, Inc.

SPINA, J.  We consider in the present case challenges brought against two ordinances adopted by the city of Springfield (city) in response to a wave of foreclosures triggered by the economic downturn of 2008.  The United States Court of Appeals for the First Circuit has certified the following questions to this court, pursuant to S.J.C. Rule 1:03, as appearing in 382 Mass. 700 (1981):[2]

> "1.  Are Springfield's municipal ordinances Chapter 285, Article II, 'Vacant or Foreclosing Residential Property' (the [f]oreclosure [o]rdinance) or Chapter 182, Article I, 'Mediation of Foreclosures of Owner-Occupied Residential Properties' (the [m]ediation [o]rdinance) preempted, in part or in whole, by those state laws and regulations identified by the plaintiffs?

> "2.  Does the [f]oreclosure [o]rdinance impose an unlawful tax in violation of the Constitution of the Commonwealth of Massachusetts?"

Easthampton Sav. Bank v. Springfield, 736 F.3d 46, 53 (1st Cir. 2013).

---

[2] Supreme Judicial Court Rule 1:03, as appearing in 382 Mass. 700 (1981), provides:  "This court may answer questions of law certified to it by . . . a Court of Appeals of the United States . . . when requested by the certifying court if there are involved in any proceeding before it questions of law of this State which may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent in the decisions of this court."

We answer the first question that the mediation ordinance is preempted by G. L. c. 244 and that the foreclosure ordinance is preempted by G. L. c. 21E and G. L. c. 111 but not by G. L. c. 244. We answer the second question in the negative.[3]

1. Procedural background. We summarize certain undisputed facts in the order of certification and in the record before us. In 2011, in response to an increased number of foreclosures due to the housing market collapse of 2008 and its effect on public safety, the city enacted two ordinances addressing properties left vacant during or after the foreclosure process. The plaintiffs, six banks holding mortgage notes on properties in Springfield, filed suit in State court seeking declaratory and injunctive relief from the enforcement of the ordinances. The defendant city removed the case to Federal court. The Federal District Court allowed the city's motion for summary judgment. The plaintiffs appealed to the United States Court of Appeals for the First Circuit. That court determined that the outcome of the case centered on unresolved questions of Massachusetts

_____

[3] We acknowledge the amicus briefs filed by the Massachusetts Bankers Association, Inc.; the American Bankers Association, Inc.; the Massachusetts Association of Realtors; and the Real Estate Bar Association for Massachusetts, Inc., and the Abstract Club in support of the plaintiffs, and the Harvard Legal Aid Bureau, National Consumer Law Center, National Community Reinvestment Coalition, Massachusetts Law Reform Institute, and Massachusetts Alliance Against Predatory Lending; and the Massachusetts Municipal Lawyers Association, Inc., in support of the defendants.

law better suited for this Court.  We now consider the questions presented to this court.

2.  Springfield ordinances.  The two ordinances deal specifically with the foreclosure process.  The mediation ordinance is entitled "Facilitating Mediation of Mortgage Foreclosures of Owner Occupied Residential Properties" and is codified in Chapter 7.60 of Title 7 of the Revised Ordinances of the city of Springfield, 1986, as amended (city ordinances).  The foreclosure ordinance is entitled "Regulating the Maintenance of Vacant and/or Foreclosing Residential Properties and Foreclosures of Owner Occupied Residential Properties," and is codified in Chapter 7.50 of Title 7 of the city ordinances.

a.  Mediation ordinance.  The mediation ordinance establishes a program requiring mandatory mediation between mortgagors and mortgagees.  The ordinance requires that, upon giving notice of a default and the statutory right of redemption to the mortgagor, mediation must begin within forty-five days.  The mediation consists of a conference between the mortgagor and mortgagee in which the parties must make a good faith effort to renegotiate the terms of the mortgage that was the subject of the notice or otherwise to resolve the pending foreclosure.  If, after a mediation conference, the city-provided mediation program manager determines that the mortgagee has made a good faith effort to mediate but that the parties were unable to come

to an agreement to avoid foreclosure, the manager will issue a certificate stating that the mortgagee has satisfied the requirements of the mediation ordinance and authorizing the mortgagee to proceed with its rights pursuant to G. L. c. 244. Failure of a mortgagee to comply with the mediation ordinance results in a $300 fine with each day of noncompliance constituting a separate violation.

b. Foreclosure ordinance. The foreclosure ordinance requires owners of buildings that are vacant or undergoing foreclosure to register with the city. The definition of "owner" includes "a mortgagee of any such property who has initiated the foreclosure process." Under the ordinance, the mortgage foreclosure process is initiated by "taking possession of a residential property pursuant to [G. L. c. 244, § 1]; [or by] commencing a foreclosure action on a property in any court of competent jurisdiction, including without limitation, filing a complaint in Land court under the Servicemembers Civil Relief Act -- Public Law 108-189 (50 U.S.C.S. App. § 501-536)." In addition, "where the mortgage authorizes [the] mortgagee entry to make repairs upon the mortgagor's failure to do so," the mortgagee has "initiated" the foreclosure process. Read together, a mortgagee whose mortgage expressly authorizes entry to make repairs upon the mortgagor's failure to do so is an

owner under the ordinance without any consideration as to whether the mortgagor has vacated the property.

Under the foreclosure ordinance, an "owner" as defined in the ordinance is responsible for the maintenance of the property. The ordinance specifies the minimum requirements of maintenance, including the filing of a space utilization plan with the fire commissioner; the removal of hazardous material from the property; the securing of windows and doorways or the provision of twenty-four hour on-site security; the removal of trash, debris, and stagnant water; the draining of water from plumbing if the property is vacant; the procurement of liability insurance for the property; and the provision of a $10,000 cash bond against the possibility of noncompliance. Upon the satisfaction of these conditions, the city will issue a certificate of compliance to the owner.

If an owner fails to register a vacant or foreclosing property with the city and to obtain a certificate of compliance, the building commissioner, once notified, is empowered to give notice and order the owner to bring the property into compliance with the foreclosure ordinance. Failure to comply with an order to register and its attendant conditions authorizes the building commissioner and his agents to enter the property to inspect it and bring it into compliance with the ordinance. An owner must pay any expenses incurred by

the commissioner in securing an unregistered property within seven days of receipt of notice, or the city may file a notice of claim against the property and obtain a lien.  The ordinance's requirement of a $10,000 bond ensures that, should the owner of a property subject to the ordinance fail to maintain the property according to the strictures of the ordinance, the city will be able to recoup the costs of entering the property and satisfying the maintenance requirements.  If the property is registered and the owner fails to pay the expenses incurred by the city, the city may draw down the posted bond.  Furthermore, the city will retain an unspecified portion of the bond as "an administrative fee to fund an account for expenses incurred in inspecting, securing, and marking said building and other such buildings that are not in compliance with [the foreclosure ordinance]."[4]  Finally, failure to comply with the foreclosure ordinance results in a $300 per day fine with each day constituting a separate violation.

3.  Preemption.  The Home Rule Amendment authorizes a municipality by ordinance or bylaw to "exercise any power or function which the general court has power to confer upon it, which is not inconsistent with the constitution or laws enacted by the general court in conformity with powers reserved to the

---

[4] The city has represented that this fee would likely be between $500 and $1000.  Easthampton Sav. Bank v. Springfield, 736 F.3d 46, 49 n.3 (1st Cir. 2013).

general court by section eight" of the Home Rule Amendment. See art. 89, § 6, of the Amendments to the Massachusetts Constitution. See also G. L. c. 43B, § 13 (Home Rules Procedures Act). Municipal bylaws are presumed to be valid. Marshfield Family Skateland, Inc. v. Marshfield, 389 Mass. 436, 440 (1983). The plaintiffs argue that the ordinances are inconsistent with several laws enacted by the General Court and thus are unconstitutional. The city argues that no conflict exists with the specified laws and that, should this court conclude otherwise, the foreclosure ordinance by its own language avoids any conflict.

In determining whether a local ordinance or bylaw is inconsistent with a State statute, the "question is not whether the Legislature intended to grant authority to municipalities to act . . . , but rather whether the Legislature intended to deny [a municipality] the right to legislate on the subject [in question]." Wendell v. Attorney Gen., 394 Mass. 518, 524 (1985). Municipalities enjoy "considerable latitude" in this regard. Bloom v. Worcester, 363 Mass. 136, 154 (1973). There must be a "sharp conflict" between the ordinance or bylaw and the statute before a local law is invalidated. Id. Such a conflict "appears when either the legislative intent to preclude local action is clear, or, absent plain expression of such intent, the purpose of the statute cannot be achieved in the

face of the local by-law." Grace v. Brookline, 379 Mass. 43, 54 (1979).

Legislative intent to preclude local action can be express or inferred. St. George Greek Orthodox Cathedral of W. Mass., Inc. v. Fire Dep't of Springfield, 462 Mass. 120, 126 (2012). When express, the task of determining the inconsistency between a local enactment and a State law is relatively easy. See Wendell, 394 Mass. at 524. More difficult are the instances when the Legislature is silent on the issue of local regulation and a party challenging a local enactment asserts that "a legislative intent to bar such local action should be inferred in all the circumstances." Id. When "legislation on a subject is so comprehensive that an inference would be justified that the Legislature intended to preempt the field," a municipal law cannot stand. Id. See Anderson v. Boston, 376 Mass. 178, 186 (1978) (construing campaign finance laws as "preempting any right which a municipality might otherwise have to appropriate funds for the purpose of influencing the result on a referendum question"). "In a close case, the considerations influencing the decision depend on the particular circumstances and a perception of the extent to which the Legislature has or has not made a preemptive intent clear. In such an analysis, it is not inappropriate to take note of what has or has not been

traditionally a matter of local regulation." Wendell, 394 Mass. at 525.

The plaintiffs have identified three statutes that they argue are in conflict with the ordinances:  G. L. c. 244, the Massachusetts foreclosure statute; G. L. c. 21E, the Massachusetts Oil and Hazardous Material Release Prevention Act (OHMRPA); and G. L. c. 111, §§ 127A-127L, the State sanitary code.  We address each in turn.

a.  Massachusetts foreclosure statute.  The plaintiffs argue that the foreclosure statute preempts the foreclosure ordinance.  The First Circuit has asked us also to consider whether the foreclosure statute preempts the mediation ordinance.  As we explain, we conclude that the foreclosure statute preempts the mediation ordinance in whole but find no preemption of the foreclosure ordinance.

i.  Mediation ordinance.  General Laws c. 244 establishes three means by which the equity of redemption of a mortgage may be foreclosed.  They are foreclosure (1) by action, G. L. c. 244, §§ 3-10; (2) by entry and possession, G. L. c. 244, §§ 1, 2; or (3) by sale under the power of sale in a mortgage, G. L. c. 244, §§ 11-17C.  General Laws c. 244, § 35A, as amended by St. 2010, c. 258, § 7, gives a mortgagor of residential real property in the Commonwealth 150 days to cure a payment default before foreclosure proceedings may be commenced.  A foreclosing

mortgagee may reduce the 150-day period to ninety days by certifying that it has engaged "in a good faith effort to negotiate a commercially reasonable alternative to foreclosure . . . involv[ing] at least 1 meeting, either in person or by telephone, between [the parties or their representatives,]" and that the meeting was not successful.  G. L. c. 244, § 35A (b). A good faith effort requires the mortgagee to consider the mortgagor's current circumstances, an analysis of the net present value of a modified mortgage loan compared to the "anticipated net recovery following foreclosure[,] and . . . the interests of the creditor."  G. L. c. 244, § 35A (c).  Should the good faith effort fail, the mortgagee must provide the mortgagor with an affidavit setting forth "the time and place of the meeting, parties participating, relief offered to the borrower, a summary of the creditor's net present value analysis and applicable inputs of the analysis and certification that any modification or option offered complies with current [F]ederal law or policy."  G. L. c. 244, § 35A (f).

A comparison of the foreclosure statute and the mediation ordinance reveals similar attempts to give mortgagees an incentive to negotiate with the mortgagors before proceeding to foreclose.  The city contends that the mediation ordinance complements and does not conflict with the foreclosure statute because a mortgagee could comply with both laws.  We disagree.

The Legislature's decision to utilize the proverbial "carrot" of a shorter right-to-cure period trumps the city's choice of the "stick" of a daily fine. Furthermore, the ordinance by its own terms does not allow a mortgagee to proceed with foreclosure before obtaining a certificate of good faith mediation, a direct impingement on the process of foreclosure.

Mortgage foreclosure regulation traditionally has been a matter of State, and not local, concern. See Walsh, The Finger in the Dike: State and Local Laws Combat the Foreclosure Tide, 44 Suffolk U. L. Rev. 139, 180-187 (2011) (reviewing legal challenges to efforts by municipalities to regulate mortgage foreclosure process). See BFP v. Resolution Trust Corp., 511 U.S. 531, 541-542 (1994) (noting traditional State-level management of foreclosure). The mediation ordinance alters what the Legislature determined, as a matter of policy, to be the just medium between the parties involved in the contemplation of a mortgage foreclosure. By so doing, the ordinance necessarily "frustrate[s] the purpose" of the foreclosure statute. Wendell, 394 Mass. at 529.

The Legislature's amendment of the foreclosure statute in 2012 provides further support for our conclusion that the foreclosure process is wholly a matter of State regulation absent an expression of a clear intent to allow local regulation. General Laws c. 244, § 35B, inserted by St. 2012,

c. 194, § 2, prohibits a mortgagee from proceeding with foreclosure by sale if the mortgage loan at issue in the foreclosure qualifies as a "certain mortgage loan," as defined by G. L. c. 244, § 35B (a). If the loan qualifies, the mortgagee must conduct an analysis of whether the mortgagor is capable of paying a modified mortgage loan, and it must offer the mortgagee any such identified loan. See G. L. c. 244, § 35B (b). This analysis and offer, if any is forthcoming, constitute objective evidence of a good faith effort to prevent foreclosure. Id. We think the differing treatment of lenders based on the particular circumstances of the mortgage loan in question indicates that the Legislature considered and rejected other possible means of regulation. Accordingly, we discern a legislative intent to occupy the field to the exclusion of other options -- including further regulation at the local level.

ii. Foreclosure ordinance. The foreclosure statute does not preempt the foreclosure ordinance. As we stated above, G. L. c. 244 establishes procedures by which the equity of redemption in a mortgage may be foreclosed. The foreclosure ordinance does not impact that process. Although a mortgagee's duty to maintain and repair arises under the ordinance and other liabilities may arise from actions required under the ordinance, nothing in the ordinance affects the procedures for foreclosing the equity of redemption. It is immaterial for purposes of

liability under the ordinance that the ordinance considers the foreclosure process initiated at a different moment than the statute because the ordinance does not purport to have any legal effect on the statutory foreclosure process.[5] We therefore conclude that the foreclosure ordinance does not conflict with the foreclosure statute.[6]

b. Massachusetts Oil and Hazardous Material Release Prevention Act. As we explain, we determine that the foreclosure ordinance is inconsistent with G. L. c. 21E, the OHMRPA. The foreclosure ordinance requires an "owner of a vacant and/or foreclosing property" to "[r]emove from the property, to the satisfaction of the fire commissioner, hazardous material as that term is defined in Massachusetts General Laws, chapter 21K, as that statute may be amended from time to time . . . ." The plaintiffs argue that the foreclosure ordinance's definition of "owner" is broader than the definition

---

[5] As discussed infra, where the mortgage authorizes the mortgagee to make repairs upon the mortgagor's failure to do so, the mortgagee is deemed to have initiated the foreclosure process.

[6] The foreclosure ordinance also is not inconsistent with G. L. c. 266, § 120, the criminal trespass statute. The criminal trespass statute applies to those who enter "without right." G. L. c. 266, § 120. A mortgagee may have a right to enter property either under the terms of the mortgage or under G. L. c. 244, § 9.

included in the OHMRPA.[7]  In the plaintiff's view, this overbreadth directly places the foreclosure ordinance squarely in conflict with a clearly stated legislative policy.  We agree.

The OHMRPA is a statute "drafted in a comprehensive fashion to compel the prompt and efficient cleanup of hazardous material and to ensure that costs and damages are borne by the appropriate responsible parties.  To that end, the [Department of Environmental Quality Engineering] has promulgated extensive regulations . . . for purposes of implementing, administering, and enforcing [the OHMRPA]."  Taygeta Corp. v. Varian Assocs., 436 Mass. 217, 223 (2002).  Under the OHMRPA, a secured lender will "not be deemed an owner or operator with respect to the site securing the loan" if certain conditions are met.  G. L. c. 21E, § 2 (c).  However, this exemption from liability under OHMRPA applies only to "releases and threats of release that first begin to occur before such secured lender acquires ownership or possession of the site . . . ."  G. L. c. 21E, § 2 (c) (1).  "Nothing in this definition shall relieve a secured lender of any liability for a release or threat of release that first begins to occur at or from a site . . . during the time that such secured lender has ownership or

_____

[7] The definition of "owner" in G. L. c. 21K references the Massachusetts Oil and Hazardous Material Release Prevention Act (OHMRPA).  Both c. 21K, which addresses the mitigation of hazardous materials, and the OHMRPA utilize the same definition of "hazardous material."

possession of such site . . . for any purpose." Id. Furthermore, "[n]otwithstanding any other provision of this definition, a secured lender shall be deemed an owner or operator of an abandoned site . . . if such secured lender . . . held ownership or possession of such site . . . immediately prior to such abandonment." G. L. c. 21E, § 2 (c) (2).

The plaintiffs argue that the foreclosure ordinance forcibly exposes them to liability under the OHMRPA if, in complying with the mandate of the ordinance, they enter a property and become mortgagees in possession during or after which a release or threat of release of hazardous material occurs. The imposition of liability in such circumstances would defeat the safe harbor for secured lenders provided by the Legislature. We agree.

The OHMRPA is a "comprehensive" statute. Taygeta Corp., 436 Mass. at 223. "Legislation which deals with a subject comprehensively . . . may reasonably be inferred as intended to preclude the exercise of any local power or function on the same subject because otherwise the legislative purpose of that statute would be frustrated." Bloom, 363 Mass. at 155. Here, we can infer that the Legislature has decided that secured lenders not in possession (nor previously in possession) of a site should not be liable for any hazardous material releases at that site. The foreclosure ordinance alters that calculus by

requiring mortgagees not yet in possession to enter the property and assume possession.  In so doing, a secured lender may become liable under the OHMRPA through compliance with the foreclosure ordinance.  As such, the foreclosure ordinance is inconsistent with the OHMRPA.

The city argues that the very language of the ordinance eliminates any inconsistency between it and the OHMRPA because the ordinance does not apply to owners "exempt from such actions by Massachusetts General Laws."  We are unpersuaded by this argument.  "The existence of legislation on a subject . . . is not necessarily a bar to the enactment of local ordinances and by-laws exercising powers or functions with respect to the same subject[,]" but can be a bar when "the Legislature has . . . [impliedly] . . . forbidden the adoption of local ordinances and by-laws on that subject."  Del Duca v. Town Adm'r of Methuen, 368 Mass. 1, 11 (1975), quoting Bloom, 363 Mass. at 156.  Simply put, a municipality has no regulatory power in a field already wholly occupied by the State unless explicitly granted such power to regulate by the statute itself.  The city cannot exempt a secured lender from the foreclosure ordinance if it has no power to include the lender.  See N.J. Singer & J.D. Shambie Singer, Sutherland Statutory Construction § 47:11, at 326-327 (7th ed. rev. 2014) ("A true statutory exception exists only to exempt something which would otherwise be covered by an act").

c.  State sanitary code.  The plaintiffs challenge the foreclosure ordinance by claiming it is inconsistent with the Sanitary code and the regulations promulgated under it, 105 Code Mass. Regs. § 400 (1993), together known as the State sanitary code (code).  "General Laws c. 111, §§ 127A-127N, reflect a comprehensive legislative attempt to effectuate compliance with minimum health and safety standards for residential premises." Negron v. Gordon, 373 Mass. 199, 202 (1977).  A local board of health is permitted "to adopt such rules and regulations as, in its opinion, may be necessary for the particular locality under its jurisdiction; provided, such rules and regulations do not conflict with the laws of the commonwealth or the provisions of the code."  G. L. c. 111, § 127A.  Enforcement of the code and any local regulations falls to the local board of health or the Department of Public Health by service of an order on the owner of a property.  Id.  105 Code Mass. Regs. § 400.200-400.300 (1993).  The local board of health and the Department of Public Health, as well as a tenant, also may petition a court to enforce the requirements of the code.  G. L. c. 111, §§ 127A, 127C.  Among the available remedies are criminal or civil injunctive relief, correction of the violation by the board itself at the expense of the owner, appointment of a receiver, or condemnation and demolition of the building.  G. L. c. 111,

§§ 127A, 127B, 127I. 105 Code Mass. Regs. § 400.700(B) (1993). 105 Code Mass. Regs. §§ 410.910, 410.950-410.960 (2007).

The appointment of a receiver, while a familiar instrument of equity, is an extraordinary remedy. Perez v. Boston Hous. Auth., 379 Mass. 703, 735-736 (1980). General Laws c. 111, § 127I, "set[s] forth circumstances that permit a court to appoint a receiver (i.e., when it 'may' do so) as well as those circumstances when appointment of a receiver is mandated (i.e., when it 'shall' do so)." Boston v. Rochalska, 72 Mass. App. Ct. 236, 243 (2008). Section 127I "require[s] the appointment of a receiver to undertake remedial action when there are ongoing sanitary code violations in an occupied building 'and the court determines that such appointment is in the best interest of the occupants residing in the property,' but mak[es] the appointment discretionary when the building is unoccupied or, if occupied, when the best interests of occupants do not require appointment." Id. at 244.

The foreclosure ordinance amalgamates two separate enforcement procedures envisioned in the State sanitary code into a single regulatory mechanism: the use of the surety bond and direct entry by an enforcement authority. Under the State sanitary code, an enforcement authority initially can only issue an order to the owner (as defined by 105 Code Mass. Regs. § 410.020 [2007]) or petition a court for enforcement. Only

after "a failure to comply with an order . . . results in a condition which endangers or materially impairs the health or well-being of the occupant or the public" may an enforcement authority cause "such proper cleaning or repair and charge the responsible person or persons as hereinbefore provided with any and all expenses incurred." 105 Code Mass. Regs. § 410.960(A) (2007). The code requires only receivers to post a bond, not owners subject to the code. G. L. c. 111, § 127I. Even then, receivers are required to post a bond only after appointment by a court of competent jurisdiction. Id.

The foreclosure ordinance requires an owner, subject only to an administrative order and fine followed by charged expenses under the code, to post a bond to ensure compliance with the ordinance. The building commissioner may draw on the bond after failure of an owner to pay within seven days the expenses of a direct entry by the building commissioner or his agents. The code envisions that expenses for such a direct entry can be recouped by an action at law or by placing a lien on the property. 105 Code Mass. Regs. § 410.950(D) (2007). The foreclosure ordinance places a heavier burden on an owner than does the code to ensure enforcement of essentially the same mandates by requiring an owner to post a bond where the code would require none. "Given the comprehensiveness of the [code] and the remedies provided therein," it is inconsistent with the

code for a municipality to require a surety bond of an owner in situations where the code would require none. See <u>Boston Gas Co</u>. v. <u>Newton</u>, 425 Mass. 697, 704-705 (1997). In addition, the code's provision for the use of a surety bond limits the city's power to require such a bond in any other context of code enforcement. See 105 Code Mass. Regs. § 400.015 (1993) ("Nor should the existence of the State Sanitary Code limit or otherwise affect the power of any health authority with respect to any matter for which the State Sanitary Code makes no provision"). The city, by the terms of the code, may require only a surety bond in the manner the code allows. The foreclosure ordinance requires a surety bond in circumstances different from those of the code. Thus the foreclosure ordinance conflicts with the code.[8]

4. <u>Lawful fee</u>. The plaintiffs challenge the foreclosure ordinance by characterizing it as an unlawful tax instead of a lawful fee. The city imposes a charge on foreclosing mortgagees

---

[8] Although we determine that State law preempts the foreclosure ordinance, the effect of this preemption vis-à-vis a general severability clause is not before us. "Neither a trial judge nor this court can consider such alleged ordinances unless they are put in evidence." <u>Fournier</u> v. <u>Central Taxi Cab, Inc</u>., 331 Mass. 248, 249 (1954), and cases cited. Nor are local ordinances "an appropriate subject of judicial notice." <u>Lawrence</u> v. <u>Falzarano</u>, 380 Mass. 18, 25 n.10 (1980). See Mass. G. Evid. § 202(c) (2013). We note that the foreclosure ordinance, unlike the mediation ordinance, does not have a severability provision specific to itself.

to register the property with the city.[9]  "A municipality does not have the power to levy, assess, or collect a tax unless the power to do so in a particular instance is granted by the Legislature."  Silva v. Attleboro, 454 Mass. 165, 168 (2009), quoting Commonwealth v. Caldwell, 25 Mass. App. Ct. 91, 92 (1987).  The plaintiffs bear the burden of demonstrating the invalidity of the exaction.  Id.  The operation of the exaction, rather than the specific language used to describe it, ultimately demonstrates its nature.  Id.  Fees share certain common characteristics that distinguish them from taxes and establish the lens through which to determine their nature.  Doe, Sex Offender Registry Bd. No. 10800 v. Sex Offender Registry Bd., 459 Mass. 603, 610 (2011) (Doe No. 10800).  Utilizing these characteristics, we arrive at the conclusion that the monetary exaction at issue here is a lawful fee, and not a tax.

a.  Particularized benefit.  Fees "are charged in exchange for a particular governmental service which benefits the party paying the fee in a manner 'not shared by other members of society.'"  Emerson College v. Boston, 391 Mass. 415, 424 (1984), quoting National Cable Television Ass'n v. United States, 415 U.S. 336, 341 (1974).  In Doe No. 10800, we examined

_____

    [9] Because we determine that the city's requirement that a registrant post a bond is preempted by State law, we analyze this question as if the city charged a fee directly instead of retaining part of the bond.

whether an exaction that the Legislature authorized from sex offenders who were required to register with a supervisory board constituted a regulatory fee or tax.  459 Mass. at 605, 610-615. There, we further affirmed our reasoning in Silva, 454 Mass. at 170, that "the particularized benefit provided in exchange for the [regulatory fee] is the existence of the regulatory scheme whose costs the fee serves to defray."  Such fees "serve regulatory purposes either 'directly by, for example, deliberately discouraging particular conduct by making it more expensive,' or indirectly by defraying an agency's regulation-related expenses."  Id. at 171, quoting Nuclear Metals, Inc. v. Low-Level Waste Mgt. Bd., 421 Mass. 196, 201-202 (1995).

"In the context of regulatory fees, we construe the term 'benefit' broadly to encompass the provision of particular governmental services to a group of individuals whose actions have necessitated the regulatory scheme in the first instance and who should shoulder the burden of paying for such services. That this may not be viewed as a 'benefit' to [one subject to the scheme] in the traditional sense of the word does not detract from the fact that a governmental entity has provided a particularized 'service' to individuals who require it."  Doe No. 10800, 459 Mass. at 611.  The city has stated its belief that properties in foreclosure are more likely to become nuisances than other properties and that a downward spiral of

urban blight can occur as nuisance properties in foreclosure affect the values of other properties around it, thereby increasing the likelihood of foreclosure.  The foreclosure ordinance attempts to regulate this phenomenon by addressing the period of time between when a mortgagor has stopped tending to the property (due either to the futility of the exercise in the face of foreclosure and unavoidable eviction or to the fact that the property is already vacant with no party responsible for its care) and when the mortgagee or new occupant comes into possession.  While the act of foreclosing by mortgagees should not be equated with the acts of those subject to the regulatory scheme in Doe No. 10800, foreclosure is nevertheless the operation that triggers the conditions giving rise to the perceived necessity for the regulatory scheme.  That this regulatory scheme is not viewed as a benefit by the plaintiffs does not detract from the fact that the city provides a particularized service to the plaintiffs in the form of maintaining property values of their loan collateral through enforcement of the foreclosure ordinance after foreclosure has commenced.  See Nuclear Metals, Inc., 421 Mass. at 205 ("It is appropriate that the entities which generate low-level radioactive waste (and not the taxpayers of the Commonwealth) should shoulder costs associated with protecting the general public from the hazards posed by the waste").

b.  Costs.  Fees, unlike taxes, "are collected not to raise revenues but to compensate the governmental entity providing the services for its expenses."  Emerson College, 391 Mass. at 425. Here, the fee is paid into "an account for expenses incurred in inspecting, securing, and marking said building and other such buildings that are not in compliance with this Section."  See id. at 427 (stating deposit of exaction into general fund nondecisively weighs in favor of tax, not fee).  "The critical question is whether the fees are reasonably designed to compensate an entity for its anticipated regulatory expenses." Doe No. 10800, 459 Mass. at 612.  In reviewing this question, "reasonable latitude must be given to the agency in fixing charges to cover its anticipated expenses in connection with the services to be rendered."  Southview Coop. Hous. Corp. v. Rent Control Bd. of Cambridge, 396 Mass. 395, 403 (1985).  Such charges should "not be scrutinized too curiously even if some incidental revenue were obtained."  Id., quoting Opinion of the Justices, 250 Mass. 591, 602 (1924).  "Relevant expenses include both the direct and the indirect or incidental costs associated with the particular government service."  Doe No. 10800, 459 Mass. at 613.

The plaintiffs argue that the funds that do not apply directly to the registered compliant properties are utilized to secure other, noncompliant properties and are never recovered by

the original payor.  These excess monies, therefore, indicate that the exaction is excessive to the costs of the benefit.[10] This argument passes over the fact that the foreclosure ordinance envisions that the expenditures of the city in entering and securing a noncompliant property will indeed be initially financed by a portion of the administrative fee from the compliant properties paid into an account to fund the city's actions in securing the noncompliant properties but that ultimately the penalties that other properties will incur through noncompliance will cover those expenditures of the city. This initial financing of a portion of the regulatory scheme beyond the simple processing and registration of a compliant property is "an indirect or incidental cost[] associated" with the foreclosure ordinance.  Doe No. 10800, 459 Mass. at 613.

     c.  Voluntariness.  The parties agree that the exaction at issue in the foreclosure ordinance is involuntarily paid.  We have "consistently given less weight to the voluntariness factor" in the context of regulatory fees.  Silva, 454 Mass. at 172.  The purpose of the foreclosure ordinance is "to promote

---

     [10] The foreclosure ordinance does not specify the amount of the administrative fee.  Therefore, although we discuss the role of the exaction relative to costs and ultimately determine that the exaction is a fee, we can make no further determination whether the exaction unlawfully raises revenue or, alternatively, compensates the city on the record before us.  We note that the mere fact that a fee creates some revenue does not transform the fee into a tax.  See Opinion of the Justices, 250 Mass. 591, 602 (1924).

the health, safety and welfare of the public, to protect and preserve the quiet enjoyment of occupants, abutters and neighborhoods, and to minimize hazards to public safety personnel inspecting or entering such properties." Exactions founded upon the police power to regulate particular activities are regulatory fees. See id. at 168. Accordingly, in this context, the issue of voluntariness "is of no relevance in determining whether that charge is a fee or a tax." Id. at 172.

In conclusion, for the aforementioned reasons, we determine that the city's exaction from those subject to the foreclosure ordinance would be a lawful fee, rather than a tax.[11] Accordingly, we answer the second certified question in the negative.

We recognize that the city of Springfield has attempted to address the serious problem of urban blight within its borders through these ordinances. Although we conclude that the city may not achieve its goal by ordinance as it has here attempted, a solution may be provided through the Legislature.

The Reporter of Decisions is to furnish attested copies of this opinion to the clerk of this court. The clerk in turn will transmit one copy, under the seal of this court, to the clerk of

---

[11] The plaintiffs also argue that the city lacks the statutory authorization to impose this exaction. The plaintiffs point to nothing in the record to support this contention. We assume, without deciding, that the city does have this authority pursuant to G. L. c. 40, § 22F, and that the city has duly adopted this provision.

the United States Court of Appeals for the First Circuit, as the answers to the questions certified, and will also transmit a copy to each party.

<u>So ordered</u>.