NOTICE:  All slip opinions and orders are subject to formal revision
and are superseded by the advance sheets and bound volumes of the
Official Reports.  If you find a typographical error or other formal
error, please notify the Reporter of Decisions, Supreme Judicial
Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston,
MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-11822

JOHN DOE[1] & others[2] <u>vs</u>.  CITY OF LYNN.


Essex.      April 9, 2015. - August 28, 2015.

Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk, &
Hines, JJ.


<u>Sex Offender</u>.  <u>Municipal Corporations</u>, By-laws and ordinances,
    Home rule.  <u>Constitutional Law</u>, Home Rule Amendment.



<u>Civil action</u> commenced in the Superior Court Department on
April 12, 2012.

    The case was heard by <u>Timothy Q. Feeley</u>, J., on a motion
for partial summary judgment, and entry of final judgment was
ordered by him.

    The Supreme Judicial Court granted an application for
direct appellate review.


    <u>John A. Kiernan</u> (<u>Robert E. Koosa</u> with him) for the
defendant.
    <u>John Reinstein</u> (<u>Benjamin H. Keehn</u>, Committee for Public
Counsel Services, & <u>Jessie J. Rossman</u> with him) for the
plaintiffs.

---

    [1] A pseudonym.

    [2] Charles Coe and Paul Poe, also pseudonyms.  The named
plaintiffs are registered sex offenders suing on behalf of
themselves and other persons similarly situated.

Amy M. Belger, Andrew S. Crouch, & Jennifer J. Cox, for Jacob Wetterling Resource Center & others, amici curiae, submitted a brief.

HINES, J. In this appeal, we determine whether an ordinance imposing restrictions on the right of sex offenders to reside in the city of Lynn (city) is prohibited by the Home Rule Amendment, art. 89, § 6, of the Amendments to the Massachusetts Constitution, and the Home Rule Procedures Act, G. L. c. 43B, § 13. The plaintiffs, who represent a certified class of sex offenders subject to the ordinance, challenged the constitutionality of the ordinance on various grounds.[3] A judge in the Superior Court invalidated the ordinance under the Home Rule Amendment. The city appealed and we granted the plaintiffs' application for direct appellate review. We affirm the Superior Court judgment based on our conclusion that the ordinance is inconsistent with the comprehensive statutory scheme governing the oversight of convicted sex offenders, and

---

[3] The complaint alleged the following claims under the United States and Massachusetts Constitutions: (1) violation of the Home Rule Amendment (Massachusetts Constitution); (2) violation of the clauses prohibiting ex post facto laws; (3) violation of the right to substantive due process; (4) violation of the right to familial association; (5) violation of the right to be protected from cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution and cruel or unusual punishment under art. 26 of the Massachusetts Declaration of Rights; and (6) violation of the right to travel.

therefore, it fails to pass muster under the Home Rule Amendment and the Home Rule Procedures Act.[4]

Background.  We summarize the undisputed facts as drawn from the summary judgment record.

1.  The ordinance.  The city adopted an "Ordinance Pertaining to Sex Offender Residency Restrictions in the [city]" (ordinance) on January 12, 2011.  The stated purpose of the ordinance is to "reduce the potential risk of harm to children of the community by impacting the ability of registered sex offenders to be in contact with unsuspecting children in locations that are primarily designed for use by, or are primarily used by children."  Observing that "[r]egistered sex offenders continue to reside in close proximity to public and private schools, parks and playgrounds," and that "registered sex offenders will continue to move to buildings, apartments, domiciles or residences in close proximity to schools, parks and playgrounds," the city council enacted the ordinance to "add location restrictions to such offenders where the [S]tate law is silent."  The ordinance imposes broad restrictions, with only narrow exceptions, on the ability of level two and level three

---

[4] We acknowledge the amicus brief filed by Jacob Wetterling Resource Center, Association for the Treatment of Sexual Abusers, Massachusetts Association for the Treatment of Sexual Abusers, Inc., Reform Sex Offender Laws, Inc., and Florida Action Committee.

registered sex offenders to reside in the city.[5]  The ordinance

establishes the area within 1,000 feet of a school or park as a

residential exclusion zone for level two and level three sex

offenders, and includes in its description of "school" all

public, private, and church schools, and any other business

permitted as a school.  The ordinance also applies to all

temporary and permanent residences except a "residence at a

hospital or other healthcare or medical facility for less than

fourteen consecutive days or fourteen (14) days in the aggregate

during any calendar year."  The geographical and temporal reach

of the ordinance effectively prohibits all level two and level

three sex offenders from establishing residence, or even

spending the night in a shelter, in ninety-five per cent of the

---

[5] The "Ordinance Pertaining to Sex Offender Residency Restrictions in the City of Lynn" (ordinance) also creates "Child Safety Zones," wherein level two and level three sex offenders are prohibited from entering a school, park, or recreational facility except in certain circumstances and from "loiter[ing]" within 1,000 feet of such facilities.  The parties, however, focused their arguments on the residency provision of the ordinance.  The plaintiffs' motion for partial summary judgment sought invalidation of the entire ordinance. The city of Lynn (city) did not present any argument, and the court entered a judgment declaring that the "Residency Ordinance" violates the Home Rule Amendment.  Thus, we know of no compelling reason to uphold any provision of the ordinance in light of the comprehensive State law discussed herein. Accordingly, we affirm the grant of partial summary judgment in favor of the plaintiffs, which invalidated the entire ordinance.

residential properties in Lynn.[6]  The ordinance would affect, at least in some degree, all 212 registered level two and level three sex offenders residing in the city, as of April 22, 2014. A sex offender required by the ordinance to move from his or her residence could encounter similar restrictions in attempting to relocate to nearby cities and towns.  At least forty municipalities have adopted sex offender residency restrictions.[7] The expansive coverage of the ordinance is mitigated by narrow exceptions to the residency restrictions applicable to those who (1) have established, prior to the effective date of the ordinance, a permanent residence within a restricted area by purchasing real property or by being the lessee of an unexpired lease or rental agreement; (2) are a "minor"; (3) are "residing

---

[6] We note here the undisputed record evidence that of the 19,320 real estate parcels zoned as residential, 18,421 are located within 1,000 feet of a school or park.

[7] According to an affidavit dated February 20, 2014, submitted as part of the summary judgment record and not disputed by the city, the following list of forty municipalities have enacted residency restrictions on certain sex offenders: Ashland; Ayer; Barre; Barnstable; Braintree; Charlemont; Charlton; Chelsea; Colrain; Dedham; Dudley; Fall River; Fitchburg; Framingham; Hanover; Hanson; Hopkinton; Hubbardston; Leominster; Lynn; Marlborough; Mendon; Natick; Norwood; Oxford; Pembroke; Revere; Rockland; Shirley; Somerset; Southborough; Spencer; Springfield; Swansea; Townsend; Waltham; Warren; Webster; West Boylston; and Weymouth.  The plaintiffs note that the Attorney General's office has continued to approve similar regulations, citing a letter from the Attorney General to North Reading, sent under G. L. c. 40, § 32, which approved North Reading's residency restriction bylaw on January 20, 2015.

with a person related by blood or marriage within the first degree of kindred"; or (4) have been residing at a permanent residence before the school or park creating the applicable restricted area was established.

Failure to comply with the ordinance results in a penalty of $300 for each day that a sex offender subject to the ordinance remains in a restricted area thirty days after receiving a notice to move from the city, or if such sex offender moves within the city into a restricted area. Additionally, if there is a "subsequent offense," the sex offender's "landlord, parole officer and/or probation officer, and the . . . Sex Offender Registry Board" (board) shall be notified that the offender has violated a municipal ordinance.

2. Procedural history. The plaintiffs, who represent a certified class of "all registered [l]evel [two] and [l]evel [three] sex offenders who are now or who may in the future be prohibited from living at various places in the [city] by the city's ordinance pertaining to sex offender residency restrictions," commenced this action after receiving the notices to move, as authorized under the ordinance. The city sent letters notifying each that he lives within a restricted area under the ordinance and that he has thirty days from the date of the letter "to relocate to another address which is in compliance with the [o]rdinance" or be subject to a fine of $300

for each day of residing in a restricted area.[8]  The plaintiffs filed a motion for partial summary judgment on the counts in the complaint asserting that the ordinance (1) violates the Home Rule Amendment; (2) is an ex post facto law under the Federal and State Constitutions; and (3) violates the plaintiffs' right to travel under the Massachusetts Constitution.[9]  The city defended the ordinance by arguing, with regard to the Home Rule Amendment, that the residency restriction is not inconsistent with State law, and that the shared purpose -- the protection of children from sexual predators -- supports and supplements the law governing the oversight of sex offenders.

In a thorough and well-reasoned memorandum of decision, the judge granted partial summary judgment to the plaintiffs and invalidated the ordinance under the Home Rule Amendment, concluding that that "the totality of the circumstances support

---

[8] The letters state that the city is "unaware of any statutory exceptions" that may apply.

[9] During the course of litigation, the parties argued repeatedly over the scope of discovery.  The judge limited the subjects allowed in discovery and impounded identification of the plaintiffs' names.  The judge also denied the city's motions to compel the criminal records and Sex Offender Registry Board (board) classification recommendation files for the members of the plaintiff class.  Although the city argues that there are numerous material disputes of fact deriving from the limited discovery, the information that was sought is not relevant to the issue of whether the ordinance violates the Home Rule provisions.  See art. 89, § 6, of the Amendments to the Massachusetts Constitution; G. L. c. 43B, § 13.

an express legislative intent to forbid local activity in the area of the civil regulation and management of the post-incarceration lives of convicted sex offenders."  In particular, the judge determined that the ordinance is inconsistent with G. L. c. 6, §§ 178C-178Q, the Sex Offender Registry Law (registry law); and G. L. c. 123A, the law providing for the "Care, Treatment and Rehabilitation of Sexually Dangerous Persons" (SDP law).  In light of this disposition, however, the judge declined to review the remaining constitutional claims.

Discussion.  The city argues on appeal that the ordinance was adopted as a valid exercise of its police power, that there is no evidence of legislative intent to occupy the field governing the management of postincarceration sex offenders, and the ordinance does not conflict with State law.  The plaintiffs counter that the judge correctly determined that the ordinance is unconstitutional and urges this court to affirm the judge on the broader constitutional grounds asserted in their motion for partial summary judgment.  We decline to reach the broader constitutional grounds but we agree that the judge properly invalidated the ordinance as unconstitutional under the Home Rule Amendment.

A local regulation is unconstitutional under the Home Rule Amendment if it is "inconsistent" with the constitution or laws of the Commonwealth.  Connors v. Boston, 430 Mass. 31, 35

(1999).  This principle is derived from the language of the Home

Rule Amendment that provides:

> "Any city or town may, by the adoption, amendment, or
> repeal of local ordinances or by-laws, exercise any power
> or function which the general court has power to confer
> upon it, which is not inconsistent with the constitution or
> laws enacted by the general court in conformity with powers
> reserved to the general court by section eight, and which
> is not denied, either expressly or by clear implication, to
> the city or town by its charter, whether or not it has
> adopted a charter pursuant to section three."

Art. 89, § 6, of the Amendments to the Massachusetts

Constitution.  "[T]he touchstone of the analysis [of whether a

local ordinance is inconsistent with State law] is whether the

State Legislature intended to preempt the city's authority to

act."  Connors, supra, citing Bloom v. Worcester, 363 Mass. 136,

155 (1973).  Review of a local ordinance is focused on the

Legislature's preemption prerogative because, as the title

suggests, the Home Rule Amendment was enacted to restore to

municipalities the "right of self-government in local matters."

Art. 89, § 1, of the Amendments to the Massachusetts

Constitution.  The genesis of the Home Rule Amendment as a means

to expand municipal legislative authority[10] thus informs the

---

[10] The Home Rule Amendment was approved by a convention of
the House and Senate in 1963 and 1965, and adopted by the voters
in 1966.  Massachusetts Legislative Research Council Report
Relative to Revising the Municipal Home Rule Amendment, 1971
Senate Doc. No. 1455, at 58-59.  It annulled art. 2 of the
Amendments to the Massachusetts Constitution, id. at 58, which
had established municipalities as "hierarchical subordinates to

analytical directive that in reviewing a local ordinance, the "question is not whether the Legislature intended to grant authority to municipalities to act . . . , but rather whether the Legislature intended to deny [a municipality] the right to legislate on the subject [in question]." Wendell v. Attorney Gen., 394 Mass. 518, 524 (1985). "Municipalities enjoy 'considerable latitude' in this regard," and a local regulation will not be invalidated unless the court finds a "sharp conflict" between the local and State provisions. Easthampton Sav. Bank v. Springfield, 470 Mass. 284, 289 (2014), quoting Bloom, 363 Mass. at 154. A sharp "conflict 'appears when either the legislative intent to preclude local action is clear, or, absent plain expression of such intent, the purpose of the legislation cannot be achieved in the face of the local by-law.'" Easthampton Sav. Bank, supra, quoting Grace v. Brookline, 379 Mass. 43, 54 (1979). Where, as here, the

the state Legislature that could only enact local legislation after receiving an affirmative grant of power" from the Legislature. See Jerison, Home Rule in Massachusetts, 67 Mass. L. Rev. 51, 51 (1982). Article 89, § 1, of the Amendments to the Massachusetts Constitution declared: "It is the intention of this article to reaffirm the customary and traditional liberties of the people with respect to the conduct of their local government, and to grant and confirm to the people of every city and town the right of self-government in local matters, subject to the provisions of this article and to such standards and requirements as the general court may establish by law in accordance with the provisions of this article."

Legislature is silent on the issue of local regulation, we also may infer an intent to forbid local regulation if "legislation on a subject is so comprehensive that an inference would be justified that the Legislature intended to preempt the field." Easthampton Sav. Bank, supra, quoting Wendell, 394 Mass. at 524. The burden is on the challenger to establish that the local enactment is "inconsistent" with the Constitution or State law. Springfield Preservation Trust, Inc. v. Springfield Library & Museums Ass'n, Inc., 447 Mass. 408, 418 (2006), citing Grace, supra at 49-50.

We turn now to the application of these principles to the ordinance. Based on our de novo review of the judge's decision, Twomey v. Middleborough, 468 Mass. 260, 267 (2014), citing Ritter v. Massachusetts Cas. Ins. Co., 439 Mass. 214, 215 (2003), we conclude that the ordinance is inconsistent with the comprehensive scheme of legislation intended to protect the public from convicted sex offenders and, thereby, manifests the "sharp conflict" that renders it unconstitutional under the Home Rule Amendment. Although the registry law and the other laws governing sex offenders do not expressly prohibit local regulation, we infer from the comprehensive nature of the statutory scheme for oversight of sex offenders and the negative effect that the ordinance may have on the monitoring and

tracking of sex offenders, that the Legislature intended to preclude local regulation of sex offender residency options.

To provide context for our conclusion that the Legislature intended to preclude further regulation of sex offender residence options, we first recapitulate the depth and breadth of the legislation mandating oversight of sex offenders.  In 1999, the Legislature enacted a comprehensive package of laws which effected a major overhaul of the statutory scheme governing the identification, treatment and postrelease management of convicted sex offenders.  St. 1999, c. 74.  That package of laws, described as "An Act improving the sex offender registry and establishing civil commitment and community parole supervision for life for sex offenders," includes the registry law, G. L. c. 6, §§ 178C-178Q.  St. 1999, c. 74, as amended by St. 2003, c. 26, § 12.  The stated purpose of the act is to "assist local law enforcement agencies' efforts to protect their communities by requiring sex offenders to register and to authorize the release of necessary and relevant information about certain sex offenders to the public as provided in this act."  St. 1999, c. 74, § 1.  It accomplishes that purpose through three primary mechanisms:  (1) compelling sex offenders to register and maintain current personal information with the board and local police, and distributing such information in accordance with the registry law, G. L. c. 6, §§ 178C-178Q,

inserted by St. 1999, C. 74, § 2, as amended by St. 2003, c. 26, § 12; (2) civilly confining certain offenders deemed most likely to reoffend, G. L. c. 123A, inserted by St. 1999, c. 74, §§ 3-8; and (3) controlling certain aspects of the postincarceration lives of certain sex offenders, G. L. c. 127, § 133D, inserted by St. 1999, c. 74, § 9 (community parole supervision for life).

The first mechanism in the 1999 registry law, as amended through St. 2013, c. 63, requires that sex offenders update their registration information annually and when they change residences, employment, or schooling; a sex offender who is homeless must also update their registration information every thirty days and wear a global positioning system (GPS) device. G. L. c. 6, §§ 178F, 178F 1/2, 178F 3/4.  The law defines who is considered a "sex offender"; creates the board; requires sex offenders to register with the board; requires the board to create a central computerized registry of sex offender information and transmit that data to the Federal Bureau of Investigation and to police departments in the municipalities where the offender intends to live and work; creates a classification system for offenders subject to judicial review; and, after classification, requires sex offenders to maintain current registration information with local police.  G. L. c. 6, §§ 178C, 178D, 178E, 178F, 178F 1/2, 178K, 178L, 178M.  The law creates criminal penalties for failing to register and provides

a mechanism for terminating the obligation to register.  G. L.
c. 6, §§ 178F, 178G, 178H, 178K.

The registry law further provides guidelines for
determining the offender's classification level, which is based
on the risk of reoffense and the public safety interest in
making registration information available to the public.  See
G. L. c. 6, § 178K (2) (a)-(c).  In that regard, the
classification level assigned to each sex offender depends, in
part, on the amount of personal information deemed necessary for
public safety and appropriate for public availability.[11]
Registration information for level one sex offenders is not
provided to the public, information for level two and level
three offenders is available to the public by request or on the
Internet,[12] and information for level three offenders may be
disseminated actively to the public.  G. L. c. 6, §§ 178D, 178I,
178J.

---

[11]  The classification levels are to be determined based on
the risk of reoffense, the degree of dangerousness posed to the
public, and whether a public safety interest is served by public
availability of information about the sex offender.  G. L. c. 6,
§ 178K.

[12] Initially, only registration information for level three
sex offenders was publically available on the Internet.  St.
2003, c. 140, § 5.  Level two sex offenders were added in 2013.
St. 2013, c. 38, §§ 7-13.  See Moe v. Sex Offender Registry Bd.,
467 Mass. 598, 616 (2014) (declaring unconstitutional
retroactive application of amendment regarding level two data).

This framework demonstrates the legislative priority attached to monitoring the residence, employment, and schooling locations of sex offenders as a means to protect the public from sex offenders. That monitoring sex offenders is a priority is demonstrated clearly by the Legislature's choice to insert only a narrow residency restriction in the registry law. That restriction only bars level three offenders from residing in rest homes or similar long-term care facilities. G. L. c. 6, § 178K (2) (e). Although we concluded in Doe v. Police Comm'r of Boston, 460 Mass. 342, 343 (2011), that this restriction was unconstitutional without an individualized hearing to determine the risk posed by the petitioner to the vulnerable community sought to be protected, the restriction is instructive of legislative intent. This provision demonstrates that the Legislature considered and addressed potential risks involved with sex offender residency in relation to a vulnerable population. We note that the Legislature limited its restriction to those offenders seeking to reside in an integrated setting with a vulnerable population and did not include those seeking to reside geographically close to a vulnerable population. We infer from the details of the rest home restriction that the Legislature intended to exercise control over any sex offender residency requirements at the State level and that the Legislature may not have considered it

appropriate to create a blanket prohibition on residency.  The ordinance, which restricts all level two and level three sex offenders from living in ninety-five per cent of the residential areas of the city, conflicts with the relatively narrow rest home restriction created by the Legislature and is thus inconsistent with State law.

As a final observation on the legislative choice to define the sex offender residency restriction narrowly, we note the grave societal and constitutional implications of the de jure residential segregation of sex offenders.  Except for the incarceration of persons under the criminal law and the civil commitment of mentally ill or dangerous persons, the days are long since past when whole communities of persons, such Native Americans and Japanese-Americans may be lawfully banished from our midst.[13]  Also, because of the tension between a sex offender's liberty interest, Doe v. Sex Offender Registry Bd., 460 Mass. 336, 338 (2011), and the imperatives of public safety, the Legislature has demonstrated a concern for careful crafting

---

[13] For later-condemned examples of banishing communities of people in the United States, see Choctaw Nation v. Oklahoma, 397 U.S. 620, 622-627, 630-631 (1970) (early 1800s treaties forcing Indian tribes to migrate to new land uninhabited by settlers) and Korematsu v. United States, 323 U.S. 214, 216 (1944) (1940s exile of persons of Japanese ancestry from west coast).

of laws in a field fraught with constitutional peril.[14]  See

Opinion of the Justices, 423 Mass. 1201, 1202-1203 (1996)

(providing guidance from this court in determining

constitutionality of community notification provisions of

registry law).  For this reason as well, the Legislature cannot

have intended to permit local regulation of sex offender

residency.

Apart from the conflict with the registry law's narrowly

defined residency restriction, the ordinance also is

inconsistent with the registry law in that it would undermine

the effectiveness of the law's classification system.  The

Legislature set forth guidelines to be used by the board in

classifying sex offenders and included consideration of whether

the "sex offender is residing in a home situation that provides

guidance and supervision."  G. L. c. 6, 178K (1) (c).  The board

---

[14] Constitutional peril is demonstrated through several cases challenging the constitutionality of the sex offender statutes.  See, e.g., Commonwealth v. Cole, 468 Mass. 294, 296 n.4, 308 (2014) (community parole supervision for life [CPSL] violates separation of powers provision of Massachusetts Constitution); Moe v. Sex Offender Registry Bd., 467 Mass. 598, 599 (2014) (retroactive community notification of level two offenders violates due process provision of Massachusetts Constitution); Doe v. Sex Offender Registry Bd., 459 Mass. 603, 621 (2011) (challenging CPSL statute on ex post facto grounds); Opinion of the Justices, 423 Mass. 1201, 1202-1203 (1996) (advising Senate of implication of double jeopardy provision of Federal Constitution and due process, ex post facto, equal protection, and cruel and unusual punishment provisions of Federal and Massachusetts Constitutions on community notification).

expanded on that factor by requiring consideration of whether an offender's "living and work situation is stable."  803 Code Mass. Regs. § 1.40(12) (2013) (identifying supportive home environment as factor minimizing sex offender's risk to reoffend and degree of dangerousness).  By requiring level two and level three sex offenders to move from their residences or face a civil penalty of $300 per day, the ordinance disrupts the stability of the home situations of sex offenders.  As a supervised and stable home situation has been recognized as a factor that minimizes the sex offender's risk of reoffense,[15] this disruption is inconsistent with the Legislature's goal of protecting the public.  Insofar as the ordinance is intended to impose residency restrictions on those sex offenders who may pose a risk to public safety that cannot be accommodated by the

---

[15] See 803 Code Mass. Regs. § 1.40(12) (2013).  See generally In re Taylor, 60 Cal. 4th 1019, 1040-1041 (2015) (finding residency restrictions unconstitutional where restrictions increased homelessness and "hampered the surveillance and supervision" of offenders subject to restriction); Levenson & Cotter, The Impact of Sex Offender Residence Restrictions: 1,000 Feet from Danger or One Step from Absurd?, 49 Int'l J. Offender Therapy & Comp. Criminology 168, 169, 175 (2005) (decreased housing options from residency restrictions result in homeless and transience, make monitoring and treatment more difficult, and exacerbate sex offender recidivism); Yung, Banishment by a Thousand Laws: Residency Restrictions on Sex Offenders, 85 Wash. U. L. Rev. 101, 141-142 (2007) (potential of sex offender ghettos to provide networking opportunities for future offenses and create "environments in which sexual violence is the norm, not the exception").

registry law, the second mechanism in the 1999 package of laws, the SDP law, serves that purpose. St. 1999, c. 74, §§ 3-8, amending G. L. c. 127A. Through the civil commitment procedure under G. L. c. 123A, the Legislature already has provided a method to exclude those sex offenders determined to be most likely to reoffend from the general population, even after their incarceration has been completed. G. L. c. 123A. Before a sex offender is released from incarceration, confinement, or commitment (with a limited exception for an offender imprisoned for six months or less on a parole violation), a determination is made whether that offender is likely to be a sexually dangerous person. G. L. c. 123A, §§ 12-13. If a judge determines, in accordance with certain procedures and evidentiary standards, that an offender has been "convicted of a sexual offense, suffers from a mental abnormality or personality disorder that renders him a menace to the health and safety of others, and is likely to engage in sexual offenses if not confined," the Commonwealth may civilly confine the offender.[16] Commonwealth v. Fay, 467 Mass. 574, 580, cert. denied, 135 S. Ct. 150 (2014), citing G. L. c. 127A, §§ 1, 14. See Fay, supra

---

[16] A committed sex offender may be discharged after a hearing if the trier of fact does not find that the person remains a sexually dangerous person. G. L. c. 123A, § 9. If discharge is granted, notice is given to local police where the offender plans to reside and other applicable parties. Id.

at 585, n.13. Accordingly, the SDP law is the Legislature's chosen method to control sex offenders where it has been determined that maintaining and distributing the offender's registry information is insufficient to protect a community's public safety interest. The SDP law, therefore, further demonstrates the intent of the Legislature to focus on maintaining and distributing sex offender information as a means to protect the public for offenders who are not deemed dangerous enough to confine and the ordinance conflicts with that purpose by intruding on the controls deemed appropriate by the Legislature.

The third mechanism in the 1999 package of laws, the community parole supervision for life (CPSL) law,[17] together with other parole and probation laws, was intended to allow the Commonwealth to control sex offenders' postincarceration lives by requiring certain conditions dependent on the offender's particular situation. See G. L. c. 127, §§ 133A (parole), 133D (CPSL), and 133D 1/2 (parole and CPSL controls); G. L. c. 265, § 47 (probation controls). In addition to discretionary controls that may be assessed, the Legislature mandated that all

---

[17] In Commonwealth v. Cole, 468 Mass. 294, 305-306 (2014), we held that the CPSL law, G. L. c. 127, § 133D, violated the constitutional mandate of separation of powers.

persons under such controls wear a GPS device and be subject to certain geographic exclusion zones, "in and around the victim's residence, place of employment and school and other areas defined to minimize the [offender's] contact with children, if applicable."  G. L. c. 127, § 133D 1/2.  G. L. c. 265, § 47.  See Commonwealth v. Guzman, 469 Mass. 492, 493 (2014) (GPS monitoring mandatory where defendant sentenced to probationary term for enumerated offense).[18]  The targeted approach to controlling sex offenders based on their particular circumstance and the GPS requirements set forth by the Legislature demonstrates the intent to encourage sex offender monitoring with minimum disruption to the stability of a broad population of offenders.

In addition to the three mechanisms contained in the 1999 package of laws, other laws support the legislative goal of protecting communities through monitoring sex offenders and controlling only specific situations most likely to cause harm.  First, the various methods used to encourage registration demonstrate that maintaining current sex offender information is

---

[18] The city argues that parole and probation statutes may not be considered in our analysis because none of the named plaintiffs is subject to the controls contained therein.  The statutes, however, are instructive as to the Legislature's intent for controlling sex offenders after incarceration and, therefore, are relevant to our analysis even if they do not affect the named plaintiffs.

a primary goal. In addition to the criminal penalties contained in the registry law, G. L. c. 6, § 178H, the Legislature mandates that transient benefits be withheld, G. L. c. 18, § 38, and motor vehicle licenses and registration be suspended, G. L. c. 90, § 22 (j), if a sex offender has not maintained current registration information. The Legislature also has imposed narrow restrictions to protect certain vulnerable communities from interaction with sex offenders instead of broadly affecting housing options for sex offenders. General Laws c. 6, § 178K (2) (e), inserted by St. 2006, c. 303, § 6, prohibits level three sex offenders from living a rest home or other regulated long-term care facility. [19] In addition to this restriction, the Legislature has limited a sex offender's ability to live with adopted or foster children, G. L. c. 119, § 26A, or to work as a child care provider, G. L. c. 15D, §§ 7, 8, a school bus operator, G. L. c. 90, §§ 8A, 8A 1/2, or an ice cream truck vendor, G. L. c. 265, § 48.

Conclusion. The totality of the 1999 statutory scheme, incorporating as it does a series of interdependent policies and practices specifically designed to protect the public from level

---

[19] This court deemed this provision to be unconstitutional as applied where there was no individualized determination of the risk of danger to the facility residents intended to be protected by the provision. Doe v. Police Comm'r of Boston, 460 Mass. 342, 351 (2011).

two and level three sex offenders by monitoring and notification to the public, evinces the Legislature's intent to have the first and final word on the subject of residency of sex offenders.  In addition, insofar as the ordinance effects a wholesale displacement of sex offenders from their residences, it frustrates the purpose of the registry law and, therefore, is inconsistent and invalid under the home rule provisions. Wendell, 394 Mass. at 527-528, citing Bloom, 363 Mass. at 156. Accordingly, we affirm the judgment of the Superior Court invalidating the "Residency Ordinance."  In light of this disposition, we need not reach the broader constitutional grounds asserted by the plaintiffs and the amici.  Commonwealth v. Raposo, 453 Mass. 739, 743 (2009), quoting Commonwealth v. Paasche, 391 Mass. 18, 21 (1984) ("We do not decide constitutional questions unless they must necessarily be reached").

So ordered.