APT Asset Management, Inc., & another[1] *vs.* Board of
Appeals of Melrose.

No. 97-P-2213.

Suffolk. September 10, 1999. - September 27, 2000.

Present: Perretta, Greenberg, & Lenk, JJ.

*Assisted Living Residence. Zoning,* Assisted living residence, Judicial review.
*Municipal Corporations,* By-laws and ordinances. *Statute,* Construction.

Discussion of the statutes and regulations establishing and regulating assisted
living residences, G. L. c. 19D and 651 Code Mass. Regs. §§ 12.01 et seq.
[134-135]

A judge of the Land Court correctly concluded that the question on judicial
review of a decision of a zoning board of appeals denying an application
for a special permit concerned a question of law, that is, the proper
construction of the applicable zoning ordinance on undisputed facts. [138]

A Land Court judge correctly concluded that an assisted living residence
within the meaning of G. L. c. 19D was not exempt from local zoning
regulations, and that such a facility was neither a residential use nor an
apartment house or multifamily dwelling under the prohibitive provisions
of the applicable ordinance and thus was not permitted in a residential
district as of right. [138-143]

Civil action commenced in the Land Court Department on
June 21, 1996.

The case was heard by *Mark V. Green,* J., on a motion for
summary judgment.

*Robert E. McDonnell* for the plaintiffs.

*Donald L. Conn, Jr.,* for the defendant.

Perretta, J. This appeal brings before us the question of
whether an "assisted living residence," as defined by G. L.
c. 19D, § 1, may be maintained in an "urban residence" district,

[1]John M. Curry, trustee of the Coolidge Trust, the legal owner of the
property at issue. Curry is also the principal shareholder of APT Asset Manage-
ment, Inc., and a general partner of APT Correlative Housing, Inc. Limited
Partnership, the beneficial owner of the property.

"UR-D," zoned for multifamily dwellings and apartment houses under the Melrose zoning ordinance. The issue came before the defendant board of appeals of Melrose (board) when the plaintiff APT Asset Management, Inc., applied for a special permit for accessory off-street parking in excess of four spaces to serve the proposed residence which it maintained was permitted as matter of right in a UR-D district. The board denied the application on the basis that, as the principal use of the residence was not permitted as of right in the district, it could not support an accessory parking use. The plaintiffs (collectively, APT) brought an appeal in the Land Court and sought a declaration that use of the structure as an assisted living residence was permitted as matter of right under the zoning ordinance. On undisputed facts, a Land Court judge concluded that the ordinance did not permit the residence in a UR-D district as matter of right and affirmed the board's decision. On appeal before us, APT makes essentially the same arguments as those raised in the trial court. We agree with the Land Court judge's reasoning and affirm the judgment.

1. *Assisted living residences.* By St. 1994, c. 354, § 3, the Legislature enacted G. L. c. 19D, an act establishing and regulating assisted living residences. It did so for the purposes expressed in St. 1994, c. 354, § 1:

> "The purpose of this act is to promote the availability of services for elderly or disabled persons in a residential environment; to encourage the development of residential alternatives that promote the dignity, individuality, privacy and decision-making ability of such persons; to provide for the health, safety, and welfare of residents in assisted living residences; to promote continued improvement of such residential alternatives; to encourage the development of innovative and affordable residential alternatives for such persons; and to encourage the provision of economic, social and health services to residents through such residential alternatives by sponsors of assisted living residences and community agencies. The general court recognizes that assisted living residences are an important part of the spectrum of living alternatives for the elderly in the commonwealth. The general court further recognizes that assisted living residences should be operated and regulated as residential environments with supportive

services and not as medical or nursing facilities. In support of the goal of aging in place, the services available in these residential alternatives, either directly or through contract or agreement, are added, increased or adjusted to compensate for the physical or cognitive impairment of the individual while maximizing the individual's dignity and independence."

As defined by G. L. c. 19D, § 1, an assisted living residence is:

"[A]ny entity, however organized, whether conducted for profit or not for profit, which meets all of the following criteria:

1. provides room and board; and

2. provides, directly by employees of the entity or through arrangements with another organization which the entity may or may not control or own, assistance with activities of daily living for three or more adult residents who are not related by consanguinity or affinity to their care provider; and

3. collects payments or third party reimbursements from or on behalf of residents to pay for the provision of assistance with the activities of daily living or arranges for the same."

Additionally, G. L. c. 19D, and 651 Code Mass. Regs. §§ 12.01 et seq. (1996), require that anyone seeking to establish or maintain an assisted living residence be certified by the Executive Office of Elder Affairs, that the residence meet certain structural requirements, and that specific and detailed services be available to the residents. See generally Goldberg, Assisted Living in Massachusetts: Another Way of Caring, 41 B.B.J. 10 (1997).

2. *The facts.* We recite the undisputed facts as they appear in the materials submitted by APT on its motion for summary judgment. APT acquired the property from the city in 1981 subject to a deed that restricted its use to residential purposes. The building, known as the Coolidge School Apartments, contains forty-nine units as well as a common room with cooking facilities and a management office.

In 1996, APT decided to convert the apartment building into an assisted living residence within the meaning and scope of G. L. c. 19D. As proposed, the residence will contain eighty private rental apartments for elderly tenants. The units will range from studios to two-bedroom apartments. Each unit will contain a full bath, a kitchenette for convenience snacks (including a sink and mini-refrigerator), and individual controls for heat and air conditioning. In addition, there will be several common areas, including living rooms or parlors on each floor, two main common dining rooms in which up to three meals a day will be served, a private dining room, country kitchens for families and visitors, a pub and game lounge, a library, a beauty salon and barber shop, exercise areas and equipment, outdoor patios, gardens and seating areas, laundry facilities, a mail and package receiving area, and storage rooms. Other than modifying an exterior loading and delivery platform, the building's exterior will remain unchanged.

In addition to the physical amenities of the proposed residence, APT intends to provide personal care services to assist residents with their routine daily activities, such as bathing, dressing, ambulating, eating, and hygiene concerns. Housekeeping and transportation services as well as social and recreational activities will be provided. Health care services (maintenance of medical records and medication management as well as other personal services) will also be available. Toward this end, there are to be two nursing stations and a "wellness center." The wellness center will occupy approximately 4,000 square feet, which is six per cent of the total interior space.

Although the zoning ordinance nowhere defines the term assisted living residence, the city's building commissioner preliminarily determined that the residence was most similar to a dormitory, a use permitted as of right in a UR-D zoning district. However, he also concluded that APT would need a special permit for accessory off-street parking in excess of four spaces. APT applied to the board for that special permit, and thus began the controversy.

After a public hearing on APT's application, the city solicitor, at the request of the board, gave his opinion that an assisted living residence was a multifamily dwelling (permitted as of right in the district) with the addition of "other support

services."[2] Following a second public hearing, the board denied the plaintiffs' application for a special permit for accessory off-street parking.

3. *The board's decision.* The board began its decision by citing § 5.1 of the ordinance ("[a]ny use not listed [in the table of use regulations] shall be construed to be prohibited") and noting that " '[a]ssisted living' is not specifically listed as a permitted use within the UR-D district." The board then went on to consider whether, as APT argued, the residence was a multifamily dwelling. Although the board saw similarities between an assisted living residence and a multifamily dwelling, it concluded that there were "basic and substantial differences" between the two uses. As explained by the board:

> "The relationship between a tenant and landlord in a multi-family dwelling is substantially different from the relationship between a resident and the care provider in an assisted living facility. . . . [T]here is a measure of 'care' which residents in an assisted living facility can expect, beyond and different from the reasonable expectations of tenants in a multi-family dwelling. The reasonable expectation of some measure of care is inherent in the very definition of an assisted living residence provided by Chapter 19D, which requires that assistance with activities of daily living will be provided by a *'care provider.'* (Emphasis added).

> "It appears to us that for purposes of the [zoning ordinance] 'assisted living,' although neither mentioned nor defined therein, falls along a continuum somewhere short of a nursing home, but further than an apartment house or multi-family dwelling.

> "It seems clear that the concept of 'assisted living' is so

[2]The city solicitor did not agree with the building commissioner that the facility was most similar to a dormitory. Although the zoning ordinance does not define the term "dormitory," § 2.1 expressly states that words not defined in either the ordinance or the city building code are to "have the meaning given in Webster's Unabridged Dictionary." As there defined (3d ed. 1993), a "dormitory" is a "room intended primarily to be slept in; esp.: a large room providing sleeping quarters for many persons and sometimes divided into cubicles." Further, § 2.1 of the ordinance expressly excludes a dormitory from the definition therein given to a "dwelling."

new . . . that our local zoning [provisions] have not caught up with what might well be a use the city wishes to authorize. However, it is beyond our jurisdiction or authority to bridge the apparent gap in our bylaws."

4. *The applicable standard of review.* The facts have never been in dispute. However, the board's position is, and has been, that the only question open upon judicial review of its decision concerns its denial of an application for a special permit and that, therefore, its action can be disturbed only upon a showing that the decision was unreasonable, whimsical, capricious, or arbitrary. We do not agree. The board's denial of the special permit for accessory parking was expressly based upon the sole reason that the principal use was prohibited under the ordinance, as construed by the board. Cf. *Prudential Ins. Co.* v. *Board of Appeals of Westwood,* 23 Mass. App. Ct. 278, 280-283 (1986).

The Land Court judge correctly concluded that the issue before him concerned a question of law, that is, the proper construction to be given to the applicable provisions of the zoning ordinance on the undisputed facts. He was also correct in concluding that the ordinance was to be construed in accordance with ordinary principles of statutory construction, with some measure of deference given to the board's interpretation. See *Advanced Dev. Concepts, Inc.* v. *Blackstone,* 33 Mass. App. Ct. 228, 231 (1992), and cases therein cited.

5. *Discussion.* Relying upon the clear and unambiguous language of § 5.1 of the ordinance ("[a]ny use not listed [in the table of use regulations] shall be construed to be prohibited") and a basic principle of statutory construction, that is, the "express mention of one matter excludes by implication other similar matters not mentioned," *Selectmen of Hatfield* v. *Garvey,* 362 Mass. 821, 824 (1973), quoting from *Foster* v. *Mayor of Beverly,* 315 Mass. 567, 569 (1944), the Land Court judge concluded that the ordinance is "prohibitive" rather than "permissive," that is, uses not expressly authorized by its terms are prohibited.

APT's first argument is that, because the provisions and purpose of G. L. c. 19D require that assisted living residences be residential in nature and character rather than "disguised version[s] of institutional, care-giving entities," its proposed project must be treated and recognized as a multifamily dwelling as defined by the ordinance and, therefore, permitted as of right. We do not agree.

By enactment of G. L. c. 19D, § 18(*a*), (*b*), and (*c*), the Legislature specifically exempted assisted living residences from the mandates of numerous statutes, including G. L. c. 40A, § 9, seventh par. (special permit for "shared elderly housing" not to exceed six occupants). Moreover, in G. L. c. 19D, § 18(*d*), the Legislature implicitly recognized that assisted living residences *could* fall within a nonresidential use classification for zoning purposes. Section 18(*d*) reads:

> "Regardless of the designation of an assisted living residence as a residential, institutional or other use under any zoning ordinance, assisted living residences certified under this chapter shall be regarded as residential uses for the purposes of the state building code and shall be so regarded by the building inspectors of each city and town in the commonwealth."

The characterization of assisted living residences as residential uses is pointedly in connection with the State building code. There is nothing in G. L. c. 19D, § 18, which would allow us to construe it as providing assisted living residences an exemption from local zoning regulations.

APT next turns to the ordinance and argues that its proposed project falls squarely within the ordinance's definitions of apartment houses and multifamily dwellings. As defined in § 2.1 of the ordinance, an apartment house is a "building designed or intended or used as the home or residence of three (3) or more *families*, each in a separate dwelling unit, living independently of each other and who may have a common right in halls and stairways" (emphasis supplied). A multifamily dwelling also contains three or more dwelling units and includes an apartment house within its meaning. The ordinance defines a "dwelling unit" as "[o]ne or more living and sleeping rooms providing complete living facilities for the use of one or more individuals constituting a *single housekeeping unit*, with permanent provisions for living, sleeping, eating, cooking, and sanitation" (emphasis supplied).

Based upon these definitions and APT's claim, the question becomes whether the services mandated by law to be provided the occupants of an assisted living residence are also permitted as of right to tenants residing in apartment houses or multifamily dwellings situated in a UR-D zoning district, or whether the

140                  50 Mass. App. Ct. 133 (2000)

APT Asset Management, Inc. *v.* Board of Appeals of Melrose.

provision of such services excludes the proposed project from the ordinance's definitions of apartment house and multifamily dwelling.[3]

In arguing that the personal care services which it must provide residents of its proposed project are comparable to those services permitted as of right to tenants residing in dwelling units in apartment houses or multifamily dwellings, APT relies upon the ordinance's inclusion of nurses and servants within its definition of "family." As set out in § 2.1 of the ordinance, a "family" is comprised of:

> "An individual or two (2) or more persons related by blood or marriage living together as a single housekeeping unit and including necessary domestic help such as nurses or servants and further including, provided dwelling is owner occupied, not more than three (3) lodgers or roomers taken for hire. A group of individuals (including necessary domestic help such as nurses or servants, but excluding lodgers or roomers taken for hire) not related by blood or marriage, but *living together as a single housekeeping unit,* may constitute a family. For purposes of controlling density, each such group of four (4) individuals shall constitute a single family." (Emphasis supplied.)

We accept APT's assertion (for purposes of decision) that, were some or all of the residents of the dwelling units in the proposed project to retain live-in nurses or domestic aides, the structure would still neatly fit within the definition of an apart-

---

[3]The statute, G. L. c. 19D, and its implementing regulations, mandate that residents of an assisted living residence, whose service plans so require, receive assistance with the activities of daily living, "including, at a minimum, assistance with bathing, dressing and ambulation," as well as "self-administered medication management" by professionally qualified and trained personnel. Residents must also be provided a minimum of one meal each day, access to community resources, housekeeping and laundry services, and daily, twenty-four hour, on-site staff capability to meet any urgent or emergency needs. See G. L. c. 19D, § 10; 651 Code Mass. Regs. §§ 12.02, 12.04(3) and (6), 12.05(1), 12.07 (1996). In addition, an assisted living residence must satisfy a panoply of other regulatory requirements in order to obtain certification from the Executive Office of Elder Affairs, which then conducts compliance reviews on a biennial basis. See G. L. c. 19D, §§ 3, 4, 5; 651 Code Mass. Regs. §§ 12.03, 12.09 (1996). Assisted living residences cannot (with limited exceptions) accept residents who require twenty-four hour, skilled nursing care services. See G. L. c. 19D, § 11; 651 Code Mass. Regs. § 12.04 (1996); 130 Code Mass. Regs. § 456.252 (1994).

ment house or a multifamily dwelling. However, such are not the facts with which we are presented. Nowhere in the record on appeal is there any assertion by APT that the persons rendering services will reside with residents in their apartments. Indeed, by definition, a "resident" of an assisted living residence is someone who "*receives* housing and personal services," not someone who provides such services. See G. L. c. 19D, § 1 (emphasis supplied).

Based upon the degree and communal nature of the personal care services required to be provided assisted living residents by persons who will not be members of any recipient's housekeeping unit, we agree with the conclusion reached by the board and the Land Court judge, that the proposed project is neither an apartment house nor a multifamily dwelling within the meaning given those structures by the ordinance, as reasonably construed.

Relying upon *Framingham Clinic, Inc.* v. *Zoning Bd. of Appeals of Framingham*, 382 Mass. 283 (1981) (medical clinic that fell somewhere between hospitals and professional offices on spectrum of medical uses held to be allowed as of right under zoning provisions which allowed both hospitals and professional offices as of right in the relevant zoning district), APT argues that its proposed project is permitted as of right because it fits within a combination of uses that are permitted as of right in the UR-D zoning district: multifamily dwellings, lodging houses, dormitories, fraternities and sororities, membership clubs, bus and railroad terminals, and religious, sectarian, denominational, or public educational uses.

Based upon the statute and legal precedent, as well as the previously recited undisputed facts, we accept the conclusion of the Land Court judge and adopt it as our own:

> "[A] material portion of the community facilities included in [APT's] proposed facility [is] different in character from those found in a dormitory, fraternity or sorority. It is the provision of medical care, with medical professionals staffing an on-site facility from which such care is provided, that sets the facility apart from the other uses to which [APT] wish[es] it compared. As the board noted in its decision, such care 'is inherent in the very definition of an assisted living residence provided by Chapter 19D.' The 'wellness center' and other medical and quasi-medical

services are analogous to uses sometimes found in a dormitory, in that they are provided in communal form for the benefit of residents of the facility, but they are not similar to the use characteristics of the kinds of communal services typically associated with multifamily dwellings, dormitories, fraternities or sororities."

The panoply of services which must be provided residents of an assisted living residence, see note 3, *supra,* are not normally or customarily found available in those uses defined in the ordinance and permitted as of right in the UR-D zone. Because the proposed project falls between a use permitted as of right, a multifamily dwelling, and a use permitted in a UR-D zone only by special permit, a nursing home, APT's reliance upon *Framingham Clinic, Inc., supra,* as authority for its claim that its project is permitted as matter of right is misplaced, and the argument fails.

We next consider whether the personal care services to be provided the residents of the proposed project are accessorial to the primary residential use of that property. As stated in § 2.1 of the ordinance, an accessory use is a "use incidental and subordinate to the principal use, . . . which is located on the same lot as the principal structure." As further defined, a "principal use" is:

"The main or primary purpose for which a structure or lot is designed, arranged, or intended, or for which it may be used, occupied or maintained under this ordinance. Any other use within the main structure or the use of any other structure or land on the same lot and incidental or supplementary to the principal use and *permitted* under this ordinance shall be considered as accessory use" (emphasis supplied).

See *Henry* v. *Board of Appeals of Dunstable,* 418 Mass. 841, 845 (1994); *Old Colony Council — Boy Scouts of America* v. *Zoning Bd. of Appeals of Plymouth,* 31 Mass. App. Ct. 46, 48 (1991).

Although we think the personal care services to be provided assisted living residents are less intensive than the services provided in nursing home facilities, we are not prepared to conclude that the services required by G. L. c. 19D and other pertinent regulatory provisions (see note 3, *supra)* are a non-

essential, fortuitous, or minor consequence of providing room and board to the residents of the proposed project. These services cannot be separated from the residential purpose of an assisted living residence: If the services are not provided, the facility is not an assisted living residence. G. L. c. 19D, § 1.

Even assuming that we are in error in concluding that the personal care services are not accessory uses, APT cannot prevail. The uses claimed by APT to be accessory are not permitted as of right in the UR-D district.

While APT concedes that G. L. c. 19D and the regulations promulgated pursuant thereto "create a legal status between APT and each resident that is different from the legal relationship of the average landlord with the average tenant," it makes the final argument that the Land Court judge improperly focused upon that relationship rather than upon the actual proposed residential use of the property. See, e.g., *CHR Gen., Inc.* v. *Newton*, 387 Mass. 351, 356-357 (1982) (ordinance regulating conversion of residential rental units to condominium units held invalid because it affected only ownership and not use of the property). As concluded by the Land Court judge, however, the board's decision was based upon a change in use of the property, that is, from an apartment building to a residence in which the occupants would be provided with a broad range of services by employees of the facility. Landlords do not customarily provide their tenants with most of these services nor are they required by law to do so. In our view, the nature and extent of these services constitute a change in the use of the property. See *Gamsey* v. *Building Inspector of Chatham*, 28 Mass. App. Ct. 614, 618-619 (1990) (conversion of resort motel premises to condominium ownership involved a change in quality or character as well as degree of use). The nature of the relationship between APT and each occupant of the assisted living residence was a proper factor to consider in evaluating whether the proposed project would constitute a change in the use of the property. See *Goldman* v. *Dennis*, 375 Mass. 197, 199 (1978).

6. *Conclusion.* We conclude that the Land Court judge correctly construed the Melrose zoning ordinance. APT's proposed use of its property is not permitted as of right under the ordinance, and the board acted within its authority in denying APT's application for a special permit for accessory parking in excess of four spaces.

*Judgment affirmed.*