O'BRIEN vs. BOSTON CLEAR WATER COMPANY, LLC, MISC 19-000071, MISC 19-000254

































 
 WILLIS C. O'BRIEN, MARY B. BLISS, and ANDREW J. GALLUCCI, Plaintiffs, v. BRIAN SHAFFER, ANTHONY MOCCIA, ERIC CHISHOLM, ANDERS YOUNGREN, and JOHN FALLON, as members of the Town of Lynnfield Zoning Board of Appeals, BOSTON CLEAR WATER COMPANY, LLC d/b/a POCAHONTAS SPRING, and JOHN SIEVERS, BRIAN SHAFFER, ANTHONY MOCCIA, ERIC CHISHOLM, ANDERS YOUNGREN, and JOHN FALLON, as members of the Town of Lynnfield Zoning Board of Appeals, BOSTON CLEAR WATER COMPANY, LLC d/b/a POCAHONTAS SPRING, and JOHN SIEVERS, Defendants; BOSTON CLEAR WATER COMPANY, LLC, Plaintiff v. THE ZONING BOARD OF APPEALS OF THE TOWN OF LYNNFIELD AND BRIAN SHAFFER, ANTHONY MOCCIA, ERIC CHISHOLM, ANDERS YOUNGREN AND JOHN FALLON, AS THEY ARE MEMBERS OF THE ZONING BOARD OF APPEALS OF THE TOWN OF LYNNFIELD, AND MARY BLISS, ANDREW GALLUCCI, WILLS [sic] C. O'BRIEN AND JOHN SIEVERS, Defendants
 MISC 19-000071, MISC 19-000254 
 JUNE 1, 2021
ESSEX, ss.
J. ROBERTS
MEMORANDUM OF DECISION AND ORDER ALLOWING THE MUNICIPAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT IN 19 MISC 000254 (JSDR)














 Introduction





 These consolidated cases, O'Brien v. Shaffer, 19 MISC 000071 (JSDR) and Boston Clear Water Company, LLC v. Shaffer, 19 MISC 000254 (JSDR), are appeals from a decision of the town of Lynnfield ("the Town") zoning board of appeals ("the ZBA") upholding the Town building inspector's decision that a commercial spring water business originally known as the Pocahontas Spring Water Company ("the Water Company") and located at 165 Lowell Street, Lynnfield ("the Property"), in a Single Residence RC Zoning District, was a preexisting nonconforming use that had not been abandoned or unlawfully extended, but that the Water Company was not a use allowed as of right, it not constituting a "public water supply" within the meaning of the Town's zoning bylaw ("the ZBL"). In O'Brien, abutters appealed from the conclusion that the Water Company is a lawful preexisting nonconforming use. In Boston Clear Water, plaintiff Boston Clear Water Company, LLC ("BCW") appealed from the conclusion that the Water Company is not a use allowed as of right under the ZBL. Before the court now, in the latter case, is the municipal defendants' Motion Of Defendant Zoning Board Of Appeals For Summary Judgment With Respect To Appeal Of Boston Clear Water Company, LLC ("the Motion"). For the reasons set forth below, that motion is ALLOWED. 





Background 





 The following facts established in the record and pertinent to the Motion and opposition thereto are undisputed or are deemed admitted. 





 1. BCW is a Massachusetts limited liability company. Concise Statement Of Material Facts Relied Upon By The Defendant Zoning Board Of Appeals In Its Motion For Summary Judgment With Respect To The Appeal Of Boston Clear Water Company, LLC; Boston Clear Water Company, LLC's Response To The Zoning Board Of Appeals Concise Statement Of Material Facts Filed In Support Of Its Motion For Summary Judgment With Respect To The Appeal Of Boston Clear Water Company, LLC; and Defendant Zoning Board Of Appeals' Reply To The Response Of Boston Clear Water Company, LLC To The Concise Statement Of Material Facts ("SOMF") ¶ 1.





 2. The ZBA is the duly constituted zoning board of appeals of the Town, which is a municipality in the Commonwealth of Massachusetts. SOMF ¶ 2. 





 3. BCW owns the Property. SOMF ¶ 3. 





 4. The Property is located in the Single Residence C (RC) Zoning District of the Town. SOMF ¶ 4. 





The Historical And Current Use Of The Property 





 5. BCW uses the Property to operate the Water Company. SOMF ¶ 5. 





 6. BCW sells natural spring mineral water from the Pocahontas Spring located on the Property to the public, through self-service and delivery to customers. SOMF ¶ 34. 





 7. Everyone is welcome to have access to the Property and to purchase the mineral water available there. SOMF ¶ 34. 





 8. BCW's operation of the Water Company is not seasonal; it is operated and runs on a year-round basis. SOMF ¶ 35. 





 9. BCW's sales are not limited to an over-the-counter basis, but include on-site sales, self-service and delivery. SOMF ¶ 35. 





 10. One Joseph F. Smith ("Joseph") started the Water Company in or around 1901 to supply water to the public and operated it for many years, both before and after the adoption of zoning in the Town in 1929. SOMF ¶ 32. 





 11. According to Joseph's daughter, the Water Company was located at the rear of the old Smith family homestead, which abutted Lowell Street, on a portion of the land that had been granted to the Smith family by King Charles I of England in 1640. Supplemental Appendix In Support Of Boston Clear Water Company, LLC's Opposition To Motion For Summary Judgment Of The Defendnt [sic] Zoning Board Of Appeals ("Supp. App."), Ex. 14, Affidavit Of Lucy Marie Smith Vazzana, sworn to on August 1, 2018 ("Vazzana Aff."), ¶ 2. 





 12. The Smith family farm was located across Lowell Street from the family homestead. Supp. App. Ex. 14, Vazzana Aff. ¶ 2. 





 13. The records at the Southern Essex District Registry of Deeds ("the Registry"), of which the court takes judicial notice, see Mass. G. Evid. § 201, reveal the following: 





 By deed dated April 1, 1825 and recorded in the Registry at Book 240, Page 46 ("the 1825 Deed"), Edward Southwick conveyed to Jonathan H. Smith "about forty two acres and one quarter of land with the buildings thereon; situate and lying in Lynnfield in the aforesaid county, where sd. Jonathan's Father now lives." 





 By deed dated October 16, 1939 and recorded in the Registry at Book 3203, Page 218 (Jonathan H. Smith having died and his son, Henry E. Smith, and Henry's wife, Mary L. Smith, having also died on April 7, 1909 and December 6, 1935 respectively, leaving five children including Joseph), Joseph's four siblings conveyed to him their interest in a parcel of land described as "Parcel A" on a plan entitled "Plan Showing Subdivision of Land In Lynnfield, Mass. Owned by Heirs of Jonathan H. Smith Scale 1" = 60 ft. July, 1937 R.W. Macdonald, Civil Engr." and recorded in Plan Book 73, Plan 27 ("1937 Plan"), containing 44.69 +/- acres, citing as the source of their title the 1825 Deed and the estates of Jonathan H. Smith and their parents. 





 Parcel "A" as shown on the 1937 Plan contains a homestead, two barns, a spring and the Pocahontas Tavern. 





 By deed dated December 30, 1986 and recorded in the Registry at Book 8726, Page 398, Della A. Smith conveyed to Lucy Marie Smith Vazzana the property shown as Lot 7 on a plan entitled "Plan of Land In Lynnfield Being Conveyed To Melch Bros Corp Scale 1" = 60' Aug. 15, 1968 Hayes Engineering Inc. Melrose" and recorded in Plan Book 113, Plan 97 ("the 1968 Plan"). 





 The 1968 Plan shows Lot 7 as a 3-acre parcel abutting Lowell Street on which is located a dwelling and garage along the street and a wood building and a stone well house at the rear. 





 By deed dated November 22, 1991 and recorded in the Registry at Book 11029, Page 146, Lucy Marie Smith Vazzana conveyed to herself and Lawrence M. Vazzana, as Trustees of Pocahontas Spring Realty Trust ("the Trustees"), Lot B as shown on a plan entitled "Plan of Land In Lynnfield, Mass. Scale 1"=40' July 26, 1991 Hayes Engineering, Inc. Civil Engineers & Land Surveyors 603 Salem Street, Wakefield, Mass. 01880 Tel. (617) 246-2800" and recorded in Plan Book 272, Plan 55 ("the 1991 Plan"). 





 The 1991 Plan shows a subdivision of Lot 7 on the 1968 Plan, with Lot A consisting of a 40,050 square foot parcel containing the dwelling and garage and Lot B consisting of 90,628 square feet and containing the existing wood building and the existing stone well house. 





 By deed dated June 20, 2014 and recorded in the Registry at Book 33376, Page 49, the Trustees conveyed Lot B to BCW. 





 14. Since the Water Company opened in 1901, vehicles-from horse-drawn wagons to motorized trucks and cars-have regularly come in and out of the Property to pick up and/or deliver spring water being sold there and customers have come to fill their own jugs and to purchase jugs of water at the Property. SOMF ¶ 33. 





 15. As they have since 1901, many members of the public, including Lynnfield residents, currently come to the Pocahontas Spring with their own bottles, fill their own bottles and bring them home. SOMF ¶ 36. 





 16. Some customers stay and drink water from the spring. SOMF ¶ 36. 





 17. Between 1959 and 2004, the then-operators from time to time of the Water Company filed thirty annual applications of which there are still records with the Town's board of health or the Commonwealth Department of Public Health, Division of Food and Drugs, pursuant to G. L. c. 94, § 10A, [Note 1] for permits to bottle water. Supplemental Memorandum In Support Of The Motion For Summary Judgment Of Defendant Zoning Board Of Appeals With Respect To The Appeal Of Boston Clear Water Company, LLC ("ZBA Supp. Mem."), Ex. A. 





 18. J. Warren Smith filed four applications between 1959 and 1961 entitled "Application for permit to engage in the business of manufacturing or bottling carbonated non alcoholic beverages, soda water, mineral or spring water" in which he responded to question number 10 on the application ("Is the water supply public or not"), "not." ZBA Supp. Mem. Ex A. 





 19. Pocahontas Spring Water Co., a partnership of J. Warren Smith, Joseph W. Smith and Walter E. Brown, filed three applications between 1965 and 1967, using the same application form as that used by J. Warren Smith earlier, and answering question number 10 ("Is the water supply public or private") in the same way: "not." ZBA Supp. Mem. Ex A. 





 20. LeColst Bros., Inc. d/b/a Pocahontas Spring Water filed twelve applications between 1969 and 1981, using the same application form, and answering question number 10 ("Is the water supply public or not"), "no," "not" or "no it is not." ZBA Supp. Mem. Ex A. 





 21. On October 9, 1982, the then owner of the Property, Della Smith, entered into a ten year lease of the Property with Donald and Jack LeColst ("the Lease"). ZBA Supp. Mem. Ex. B. 





 22. The Lease provided, among other things, that "[t]he Premises shall be used exclusively for the purpose of bottling and distribution of spring water, within the scope of the non-conforming use of the Premises. The Premises shall not be used for any other purpose than the spring water business and shall not violate the non conforming use of the Premises. All operations conducted on the Premises by the Tenants shall be within the non-conforming use and any written complaint from the Town of Lynnfield concerning improper use of the Premises shall be deemed a breach of this Lease and the Lease shall be terminated." ZBA Supp. Mem. Ex. B. 





 23. The Lease also provided that "Tenants agree to maintain and provide spring water to the Landlord's home at 163 Lowell Street, Lynnfield, MA. This includes the repairing and maintenance of the piping and pump in Landlord's home." ZBA Supp. Mem. Ex. B. 





 24. Donald P. LeColst, identified sometimes as doing business as Pocahontas Spring Water Company, filed four applications between 1983 and 1985, using the same application form as used earlier, and answering question number 10 ("Is the water supply public or not"), "no." ZBA Supp. Mem. Ex. A. 





 25. Donald LeColst and John LeColst doing business as Pocahontas Spring Water Co., filed three applications between 1986 and 1989, using the same application form and answering question number 10 ("Is the water supply public or not"), "not." ZBA Supp. Mem. Ex. A. 





 26. In February and December 1995, Donald P. LeColst filed a new application form entitled "Application For Permit (New Or Renewal) To Manufacture Or Bottle Water Or Carbonated Nonalcoholic Beverages Within The Commonwealth," which form required the applicant to select the type of water source for bottled water--public, artesian, well or spring-and with respect to which "spring" was designated as the source. ZBA Supp. Mem. Ex. A. 





 27. In 1996, Donald P. LeColst filed a new application form, this one addressed to the Commonwealth of Massachusetts Department of Public Health, Division of Food and Drugs and entitled "Application For Permit To Manufacture Or Bottle Water Or Carbonated Nonalcoholic Beverages Inside The Commonwealth. In Accordance With M.G.L. Chapter 94, Section 10A" but carrying forward the same question as to the type of water source for bottled water, which was again designated as "spring." ZBA Supp. Mem. Ex. A. 





 28. In 2004, Donald P. LeColst filed a new application form with the Town's board of health, answering the question "is the water supply public or not:" "private." ZBA Supp. Mem. Ex. A.





 29. In November 2005, Lawrence Vazzana and L. Marie Vazzana executed a "rental agreement" with Donald and Jacky LeColst under the terms of which the tenants were to "[c]ontinue to provide spring water to our home at 163 Lowell Street." ZBA Supp. Mem. Ex. C. 





 30. The Property is reflected on the property record cards maintained by the Assessor's Office of the Town as serving a "store" use. SOMF ¶ 30. 





The Public Water Supply In Lynnfield 





 31. For decades, the Town has been serviced by two public water supplies: the Lynnfield Water District and the Lynnfield Center Water District (BCW contends that the Town has also been serviced by a third public water supply: the Water Company). SOMF ¶ 19. 





 32. The Lynnfield Water District was established by the Legislature in 1924 "for the purpose of supplying [a portion of the Town] with water for the extinguishment of fires and for domestic and other purposes, for assessing and raising taxes as provided herein for payment of such services, and for defraying the necessary expenses of carrying on the business of said district." SOMF ¶ 19a. 





 33. The Lynnfield Center Water District was established fifteen years later for the same purpose with respect to substantially all of the rest of the Town. SOMF ¶ 19b. 





 34. All of the lots owned by the Lynnfield Water District and the Lynnfield Center Water District are reflected on the property cards maintained by the Assessor's Office of the Town as serving a "municipal" use. SOMF ¶ 29. 





 35. The Lynnfield Water District is identified by the Commonwealth's Department of Environmental Protection ("DEP") as a "community" public water system, serving a population of 4,784 persons and having 1,449 service connections. SOMF ¶ 26a. 





 36. The Lynnfield Center Water District is identified by the DEP as a "community" public water system, serving a population of 8,338 persons and having 2,721 service connections. SOMF ¶ 26b. 





 37. The Water Company is registered with the DEP as a "transient non-community" public water system, meaning that it "serves water to 25 different persons at least 60 days per year." 310 Code Mass. Regs. § 22.02 and SOMF ¶ 23. 





 38. Sagamore Spring Golf Club, Inc., also located in the Town, is identified by the DEP as a "transient non-community" public water system, serving a population that ranges seasonally between 70 and 250 persons at least 60 days per year and having one service connection. SOMF ¶ 26c.





 39. The Water Company was first approved by the DEP as a "transient non-community public water system" in 2012. SOMF ¶ 27. 





 40. The Town, through its board of health, was aware since at least 2014 that the Property had been approved and certified as a public water system by the DEP. SOMF ¶ 37. 





The ZBA Decision At Issue Here 





 41. These consolidated cases grew out of a petition to the Town's building inspector requesting enforcement against BCW's operation of the Water Company in a residential district. SOMF ¶ 6. 





 42. Although not a party to the petitioners' enforcement appeal to the ZBA, BCW participated in the ZBA's hearing, where it asserted not only that the Water Company constituted a prior, nonconforming use, but also that it was a use that BCW was entitled to practice by right as a "public water supply." SOMF ¶ 7. 





 43. The ZBA upheld the building inspector's decision that the Water Company was protected as a prior, nonconforming use. SOMF ¶ 8. 





 44. However, the ZBA also determined that the Water Company did not constitute a "public water supply" within the meaning of the ZBL, and therefore concluded that the Water Company was not a by right use under the ZBL in the Single Residence C (RC) Zoning District. SOMF ¶ 9. 





Legislative History Of The Town's ZBL 





 45. As of March 5, 1951, there were four kinds of residential districts in the Town: residence districts; single residence districts; single residence districts B and single residence districts C. Appendix In Support Of the Motion For Summary Judgment Of The Defendant Zoning Board Of Appeals With Respect To The Appeal Of Boston Clear Water Company, LLC ("App."), Ex. 3, Zoning By-Laws of the Town of Lynnfield Massachusetts (1951) ("1951 ZBL") § 1; SOMF ¶ 13. 





 46. In the residence district, ten uses were allowed as of right, including one- and two family detached houses; churches, schools, public libraries, playgrounds and similar public buildings and purposes; municipal buildings, public parks, playgrounds and similar public buildings and purposes; and "such other purposes as are customarily incidental to any of the foregoing, including private garage and private stable." App. Ex. 3, 1951 ZBL § 2. 





 47. In the single residence district, five uses were allowed as of right, including one family detached houses; parks and playgrounds; and "such other purposes as are customarily incidental to any of the foregoing, including private garage and private stable." App. Ex. 3, 1951 ZBL § 2A.





 48. In 1953, the Town substantially amended its ZBL and the purpose of those amendments was explained in a "Report on Proposed Revision of Lynnfield Zoning Bylaw" ("the Report") prepared by the Town's planning board. SOMF ¶ 16. 





 49. The Report stated that, "[a]mong the most important changes proposed is the elimination of the present 'Residence Districts,' as distinct from the present 'Single Residence Districts.' In the proposal, all residence zones will be known as Single Residence Districts, with the only differentiation between them being one of lot area, frontage, and other open space requirements. Proposed uses would be the same in all of these zones." SOMF ¶ 16. 





 50. The Report also stated that, "[i]n the Single Residence Districts of the proposed by law, some of the uses now being listed as being permitted outright would henceforth require approval of the Board of Appeals before establishment. Among these uses are boarding and lodging houses, cemeteries, hospitals, sanitariums, philanthropic and charitable institutions, commercial golf courses, and salesrooms for farm products. Such uses could only be permitted after a public hearing, and only if they were not considered by the Board as injurious to the neighborhood." SOMF ¶ 16. 





 51. The Report also stated that, "[i]nstead of permitting as at present, all 'public buildings and purposes,' the new by-law lists unobjectionable public uses by name; uses not named would be permitted only by Board of Appeal approval. Thus, for example, the establishment of a public dump in a residence district would require a hearing by the Board. Schools, now permitted without limitation, would be restricted to public schools and private schools offering general educational course [sic] ; thus a welding school, dancing school, riding school, etc., would not be allowed in a residence district. ... The proposal also adds to the list of permitted uses 'religious, sectarian and denominational educational uses' which, by statutory amendment, must be allowed in all zoning districts." SOMF ¶ 16. 





 52. The revised ZBL proposed in 1953 included a list of permitted uses in the Single Residence districts which included many of the entries in the list of "Community and Exempt Facilities" in the current Table of Use Regulations. SOMF ¶ 17. 





 53. Specifically, "public school," "public or non-profit library, museum, art gallery or civic center," "government administration building, fire or police station," and "municipal recreation or public water supply use" were made available by right. SOMF ¶ 17. 





 54. Potentially objectionable public sector uses were made subject to special permit: "Any governmental use (but including [sic] a public utility or communication use) not hereinbefore specifically listed, which is necessary for the service of the vicinity or which requires a location within the district for reason of space or function." SOMF ¶ 17. 





 55. The list of permitted uses in the Single Residence districts was presented to the Special Town Meeting held on December 4, 1953 as part of Article 1 of the Warrant and was passed with amendments not relevant here. SOMF ¶ 18. 





Relevant Provisions Of The ZBL 





 56. The Table of Use Regulations in the ZBL lists five different kinds of "principal uses:" "A. Residential; B. Community and Exempt Facilities; C. Agricultural; D. Retail, Trade and Restaurant; and E. Wholesale, Transportation and Industrial." SOMF ¶ 10. 





 57. Under the category of "Community and Exempt Facilities," the ZBL lists the following uses as permitted as of right or by special permit in the RC District: "use of land or structures for religious purposes;" "use of land or structures [owned by governmental entities, religious entities or nonprofit educational entities] for educational purposes;" "public or nonprofit library, museum, art gallery or civic center;" "municipal recreation or public water supply use;" municipally owned commercial golf course; "governmental (federal, state or municipal) administration building, fire or police station;" "cemetery, hospital, sanatorium, philanthropic or charitable institution (but not including a correctional institution);" "child care center or school-aged child care program;" "essential services," meaning services provided by a "public service corporation, as defined in M.G.L. c. 40A, § 3;" and "siting of radio telecommunication facilities." App. Ex. 2, ZBL Appendix A Table of Use Regulations. 





Analysis 





The Summary Judgment Standard 





 In assessing the Motion, the court must determine whether the "pleadings, depositions, answers to interrogatories, and responses to requests for admission ... together with the affidavits ... show that there is no genuine issue as to any material fact and that the [ZBA] is entitled to a judgment as a matter of law." Mass. R. Civ. P. 56 (c). "The moving party bears the burden of proving that there are no material issues of fact and that he is entitled to judgment as a matter of law." Highlands Ins. Co. v. Aerovox Inc., 424 Mass. 226 , 232 (1997). In viewing the factual record presented as part of the motion, the court draws "all logically permissible inferences" from the facts in favor of the non-moving party. Willitts v. Roman Catholic Archbishop of Boston, 411 Mass. 202 , 203 (1991). "Summary judgment is appropriate when, 'viewing the evidence in the light most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to a judgment as a matter of law.'" Regis College v. Town of Weston, 462 Mass. 280 , 284 (2012), quoting Augat, Inc. v. Liberty Mut. Ins. Co., 410 Mass. 117 , 120 (1991). 





Whether The ZBA Is Constrained By State Law Defining "Public Water Supply" 





 The ZBA argues, based on well-established law, that its interpretation of the ZBL to exclude the Water Company from the definition of "public water supply use" is reasonable and entitled to deference. In response, BCW contends that the ZBA's interpretation is preempted by controlling state law and is arbitrary. Because BCW's preemption argument, if correct, is dispositive, it is addressed first. 





 In Boston Clear Water Company, LLC's Opposition To The Town Of Lynnfield Zoning Board Of Appeals' Motion For Summary Judgment and in Boston Clear Water Company, LLC's Supplemental Memorandum Of Law In Opposition To The Town Of Lynnfield Zoning Board Of Appeals' Motion For Summary Judgment, BCW argues that the Water Company's designation by DEP as a "public water system" is controlling and that the Commonwealth's comprehensive statutory scheme regulating drinking water precludes local regulation of such systems through zoning. This court disagrees. 





 The starting point of the analysis is art. 89 of the Amendments to the Constitution of the Commonwealth, "commonly referred to as the Home Rule Amendment." Bloom v. Worcester, 363 Mass. 136 , 138 (1973). Section 6 of the Home Rule Amendment provides in pertinent part: 





 [a]ny city or town may, by the adoption, amendment, or repeal of local ordinances or by laws, exercise any power or function which the general court has power to confer upon it, which is not inconsistent with the constitution or laws enacted by the general court in conformity with powers reserved to the general court by section eight.





"In determining whether a local ordinance or bylaw is inconsistent with a State statute, the 'question is not whether the Legislature intended to grant authority to municipalities to act ... , but rather whether the Legislature intended to deny [a municipality] the right to legislate on the subject [in question].'" Easthampton Savings Bank v. Springfield, 470 Mass. 284 , 288-289 (2014), quoting Wendell v. Attorney Gen., 394 Mass. 518 , 524 (1985). "Municipal bylaws are presumed to be valid." Id. at 288, citing Marshfield Family Skateland, Inc. v. Marshfield, 389 Mass. 436 , 440 (1983). "There must be a 'sharp conflict' between the ordinance or bylaw and the statute before a local law is invalidated." Id. at 289, quoting Bloom, 363 Mass. at 154. "The burden is on the challenger to establish that the local enactment is 'inconsistent' with the Constitution or State law." Doe v. City of Lynn, 472 Mass. 521 , 527 (2015), citing Springfield Preservation Trust v. Springfield Library & Museums Ass'n, Inc., 447 Mass. 408 , 418 (2006). 





 "The legislative intent to preclude local action must be clear." Fafard v. Conservation Comm'n of Barnstable, 432 Mass. 194 , 203 (2000), quoting Bloom, 363 Mass. at 155. Such an intent may be express or inferred. Roma, III, Ltd. v. Board of Appeals of Rockport, 478 Mass. 580 , 588 (2018), quoting St. George Greek Orthodox Cathedral of W. Mass., Inc. v. Fire Dep't of Springfield, 462 Mass. 120 , 126 (2012). "When express, the task of determining the inconsistency between a local enactment and a State law is relatively easy." Easthampton Savings Bank, 470 Mass. at 289, citing Wendell, 394 Mass. at 524 ("The task is, of course, relatively easy if the Legislature has made an explicit indication of its intention in this respect."). Where such an intent is inferred, it may be because the Legislature has dealt with the subject comprehensively. Id. at 289 ("When 'legislation on a subject is so comprehensive that an inference would be justified that the Legislature intended to preempt the field,' a municipal law cannot stand.") (quoting Wendell, 394 Mass. at 524). "If, however, the State legislative purpose can be achieved in the face of a local by-law on the same subject, the local by-law is not inconsistent with the State legislation, unless that legislation explicitly forbids the adoption of such a by-law." Wendell, 394 Mass. at 524. 





 In addition to examining the comprehensive nature of the legislation to assess legislative intent, courts have also looked to whether the Legislature intended to create uniform standards across the Commonwealth, St. George Greek Orthodox Cathedral, 462 Mass. at 126 (State Building Code expressly intended to ensure "[u]niform standards and requirements for construction and construction materials"), or whether "the Legislature has explicitly limited the manner in which cities and towns may act on that subject." Id. at 127, citing Bloom, 363 Mass. at 155. "'In a close case, the considerations influencing the decision depend on the particular circumstances and a perception of the extent to which the Legislature has or has not made a preemptive intent clear.'" Easthampton Savings Bank, 470 Mass. at 289, quoting Wendell, 394 Mass. at 525. "'In such an analysis, it is not inappropriate to take note of what has or has not been traditionally a matter of local regulation.'" Id. 





 The Supreme Judicial Court's decision in Roma is of particular relevance. There, the town of Rockport attempted to enforce a zoning bylaw provision prohibiting the use of land for a private heliport in the absence of a variance or special permit. Because the zoning bylaw provision had not been approved by the division of aeronautics of the Department of Transportation ("the division"), a judge of this court, constrained by the Appeals Court's decision in Hanlon v. Sheffield, 89 Mass. App. Ct. 392 (2016), ruled that the zoning bylaw was preempted by the State's aeronautics code. Hanlon interpreted G. L. c. 90, § 39B, of the aeronautics code to preclude a town from enforcing a zoning bylaw that would prohibit a private landowner from creating a noncommercial private restricted landing area on his or her property unless the bylaw had been approved by the division. 





 In its analysis, the Roma court first reframed the issue presented in Hanlon: "In short, what was at issue in Hanlon was not the 'use and operation of aircraft,' the regulation of which was governed by § 39B, but the use of land, the regulation of which has traditionally been within the domain of cities and towns through their zoning authority." 478 Mass. at 585. In considering the issue as reframed, the Roma court then examined the history of zoning in the Commonwealth, noting that "[t]he Legislature has long bestowed broad authority on cities and towns to regulate the use of land through various zoning enactments," id.; that the authority of cities and towns to enact zoning bylaws predated the Home Rule Amendment; and that, from the wide scope of purposes described in the successor to the original zoning act, G. L. c. 40A, "it is apparent that the Legislature intended to permit cities and towns to adopt any and all zoning provisions which are constitutionally permissible, subject, however, to limitations expressly stated in that act (see, e.g., G. L. c. 40A, § 3) or in other controlling legislation." Id. at 586, quoting Sturges v. Chilmark, 380 Mass. 246 , 253 (1980). 





 Next, the court turned to the plaintiff's argument that, to the extent that Rockport's zoning bylaw purported to regulate land used for a noncommercial restricted landing area, the bylaw was preempted. After first considering whether state law was preempted by federal law regulating aviation and finding that it was not, 478 Mass. at 588 ("Federal case law, however, has distinguished the preempted regulation of flight operations from the permitted regulation of aircraft landing sites."), the Roma court analyzed whether the zoning bylaw was preempted by the state's aeronautics code under Bloom and its progeny described above. Because the aeronautics code did not explicitly preempt local regulation, the court considered whether an intent to preempt local regulation could be inferred. After reviewing the aeronautics code, the court expressed its concern about the impact of preemption, were it found to exist: 





 [u]nder the aeronautics code, as long as safety is not threatened, it is inconsequential whether the noncommercial private restricted landing area is located in a densely populated residential neighborhood, or whether noise, vibrations, fumes, dust, and wind arising from a heliport will interfere with the neighbors' enjoyment of their property. Consequently, if local zoning bylaws are preempted by the aeronautics code, a city or town will be unable to protect its residents from any of the potential harms and deleterious consequences that may arise from the location of a noncommercial private restricted landing area, unless the division agrees to the proposed restriction. 





Id. at 590. With that concern expressed, the court went on to reject plaintiff's (and the division's) argument that allowing local regulation of noncommercial private restricted heliports through zoning would so frustrate the division's legislative mandate to "foster . . . private flying within the Commonwealth" as to prohibit such local regulations. 





 First, the court noted that "the record is devoid of any suggestion that the Legislature considered noncommercial private restricted landing areas to be necessary, or even central, to the division's mission of fostering private flying." Id. at 591. Second, the court looked to "whether the subject matter at issue has traditionally been a matter of local regulation," citing Easthampton Savings Bank. Id. 





 Where land use regulation has long been recognized by the Legislature to be a prerogative of local government, we will not infer that the enactment of the aeronautics code reflects a clear legislative intent to preempt all local zoning bylaws that might affect noncommercial private restricted landing areas based on the risk of frustrating the legislative purpose of fostering private flying. 





Id. According to the Roma court, "[i]f the Legislature wishes to preempt local zoning regarding noncommercial private restricted landing areas, it must provide a clearer indication of such intent." Id. at 591-592. 





 Here, BCW bases its preemption argument primarily on the DEP's drinking water regulations, found at 310 Code Mass. Regs. §§ 22.01-22.27. [Note 2] Those regulations are "intended to promote the public health and general welfare by preventing the pollution and securing the sanitary protection of all such waters used as sources of water supply and ensuring that public water systems in Massachusetts provide to the users thereof water that is safe, fit and pure to drink." 310 Code Mass. Regs. § 22.01. The following definitions set forth at 310 Code Mass. Regs. § 22.02 are relevant to this action: 





 Non-zoning Controls means laws, ordinances, rules and regulations, other than Zoning Controls, adopted in accordance with the constitutional and statutory power of cities and towns to protect the health, safety and general welfare of their present and future inhabitants. 





 ... 





 Public Water System means a system for the provision to the public of water for human consumption, through pipes or other constructed conveyances, if such system has at least 15 service connections or regularly services an average of at least 25 individuals daily at least 60 days of the year. ... A Public Water System includes a "Community Water System" or a "Non-Community Water System". 





 (a) Community Water System means a Public Water System which serves at least 15 service connections used by year-round residents or regularly serves at least 25-year round residents. 





 (b) Non community Water System means a Public Water System that is not a Community-Water System. 





 1. Non-transient Non-community Water System or NTNC means a Public Water System that is not a Community Water System and that has at least 15 service connections or regularly serves at least 25 of the same individuals or more approximately four or more hours per day, four or more days per week, more than six months or 180 days per year, such as a workplace providing water to its employees. 





 2. Transient Non-community Water System or TNC means a Public Water System that is not a Community Water System or a Non transient Non community Water System, but is a Public Water System which has at least 15 service connections or serves water to 25 different persons at least 60 days per year. Some examples of these types of systems are: restaurants, motels, camp grounds, parks, golf courses, ski areas and community centers. 





 ... 





 Zoning Controls means by-laws and ordinances adopted by cities and towns in accordance with M.G.L. c. 40A. 





 In furtherance of the purpose of providing water from public water systems that is safe, fit and pure to drink , the DEP's regulations establish limits on what substances can be found in the water, establish monitoring requirements, see, e.g., 310 Code Mass. Regs. § 22.06 "Inorganic Chemical Maximum Contaminant Levels, Monitoring Requirements and Analytical Methods" (establishing maximum contaminant levels for inorganic chemicals and a sampling protocol to test for compliance); 310 Code Mass. Regs. § 22.06A "Special Monitoring for Sodium, Reporting and Analytical Methods and Frequency" (imposing requirement to monitor for sodium); and impose reporting requirements. See 310 Code Mass. Regs. § 22.03 "Compliance" ("(10) ... All water quality data for contaminants listed in 310 CMR 22.00, including additional and voluntary samples, shall be submitted to the Department, unless otherwise specified by the Department."). The regulations also establish land areas around surface water supplies, 310 Code Mass. Regs. § 22.20C, and ground water supplies, 310 Code Mass. Regs. § 22.21, that limit the uses that can be made in those areas. For example, around wells, wellfields, and springs, the following uses, among others, are prohibited: landfills and open dumps; automobile graveyards and junkyards; and facilities that generate, treat, store or dispose of hazardous waste. 310 Code Mass. Regs. § 22.21(2). Notably, these prohibitions are effectuated, at least in part, through local regulations adopted by cities and towns: "[w]ellhead protection zoning and nonzoning controls submitted to the Department in accordance with 310 CMR 22.21(1) shall collectively prohibit the following land uses within the Zone II, or Zone III if the criteria of 310 CMR 22.21(1)(f) have been met, of the proposed well, wellfield or spring." [Note 3] 310 Code Mass. Regs. §22.21(2) (b). 





 While not holding itself out as having mastered the intricacies of the DEP's drinking water regulations, this much seems clear to this court: there is no expressed intent that these regulations preempt local zoning in the siting of public water supplies. To the contrary, the regulations embrace local zoning and nonzoning controls as a means of fostering their goal of safe, fit and pure water. Moreover, there is no "sharp conflict" between the DEP's drinking water regulations and the ZBL. Reminiscent of the situation in Roma, the DEP's regulations are indifferent to where a public water supply is sited, so long as it meets the DEP's safety requirements. Add to this the long history of land use as a subject of local regulation, and the conclusion that the ZBL is not preempted by state law insofar as it defines "public water supply" is inescapable. 





The ZBA's Interpretation Of "Public Water Supply" 





 When presented with BCW's argument that the Water Company's use of the Property was allowed as of right as a "public water supply," the Water Company's designation as a "public water system" by DEP being decisive, the ZBA instead 





 concluded that this is not determinative, and that the [ZBA] must separately determine whether the use constitutes a "public water supply" use under the [ZBL]. The meaning of "public water supply" in section B.4 of Appendix A to the [ZBL] is a matter of first impression. The [ZBA], therefore, must construe this language within the context of the entire [ZBL], to give effect to its goals and purposes and to ensure consistent application of the zoning regulations set forth therein. The [ZBA] interprets the term "public water supply" under the [ZBL] to mean a water system operated by a public sector entity (such as either of the two water districts that provide water in Lynnfield) as opposed to a commercial water supply. Accordingly, by unanimous vote, the [ZBA] finds that the commercial spring water operation at the [Property] is not a by right use under the [ZBL]. 





App. Ex. 1. The relevant standard for reviewing this interpretation of the ZBL was set out in Zarba v. Chyatal, 2019 Mass. LCR LEXIS 245 (Foster, J.): 





 Generally, a local board's reasonable interpretation of its own zoning bylaw is entitled to judicial deference. APT Asset Mgmt., Inc. v. Board of Appeals of Melrose, 50 Mass. App. Ct. 133 , 138, 735 N.E.2d 872 (2000). Specifically, the court will defer to a town's interpretation of a bylaw so long as: (1) the board's decision was not based on "a legally untenable ground," meaning that the decision was not based "on a standard, criterion, or consideration not permitted by the applicable statutes or by-laws," and (2) "assuming that the board has drawn on proper criteria and standards . . . whether the board has denied the application by applying those criteria in an unreasonable, whimsical, capricious, or arbitrary manner." Britton v. Zoning Bd. of Appeals of Gloucester, 59 Mass. App. Ct. 68 , 73-74, 794 N.E.2d 1198 (2003). Reasonableness is determined by reading the bylaw at issue "in complete context" and giving it "a sensible meaning within that context." Board of Selectmen of Hatfield v. Garvey, 362 Mass. 821 , 826, 291 N.E.2d 593 (1973). 





In addition, and of particular relevance here, "[d]eference is ... owed to a local zoning board because of its special knowledge of 'the history and purpose of its town's zoning by law.'" Wendy's Old Fashioned Hamburgers of N.Y, Inc. v. Board of Appeals of Billerica, 454 Mass. 374 , 381 (2009), quoting Duteau v. Zoning Bd. of Appeals of Webster, 47 Mass. App. Ct. 664 , 669 (1999). 





 The ZBA's interpretation-that "public water supply" means a water system operated by a public sector entity, not a private or commercial entity-is reasonable and in accord with the historical treatment of the two public water supply companies and the Water Company in the Town. The two public water supply districts, the Lynnfield Water District and the Lynnfield Center Water District, were established in 1924 and 1939 respectively. See St. 1924, c. 445, § 1; St. 1939, c. 336, § 1. They are public sector entities, with their commissioners being elected by the voters residing within their geographic bounds. See St. 1924, c. 445, § 9; St. 1939, c. 336, § 9. They were created for the purpose of providing the Town with water. St. 1924, c. 445, § 1; St. 1939, c. 336, § 1. All of the properties owned by them are designated by the Assessor's Office of the Town as serving a "municipal" purpose. They serve substantially all of the Town (the Lynnfield Water District serves a population of 4,784 persons and has 1,449 service connections, while the Lynnfield Center Water District serves a population of 8,338 persons and has 2,721 service connections) and so, not surprisingly, their use is allowed as of right in all districts save the elderly housing district, where it is allowed by special permit. In contrast, the Water Company has been privately owned and operated since its creation in 1901, was considered by its owners and operators to be a private water supply in their annual applications to the Town's board of health for permits to "engage in the business of manufacturing or bottling carbonated ... spring water," and is reflected in the Assessor's Office of the Town as serving a "store" use. The Water Company has one service connection, to the house of the former owners of the Property. It also bears noting that at least one former owner of the Property considered the Water Company to be a nonconforming use under the ZBL, i.e., not a public water supply, and that the Water Company was not designated as a transient non-community public water system until 2012. It is only with the relatively recent arrival of new ownership of the Water Company, in the form of BCW, that the Water Company's status as an of right use has been asserted. 





 The ZBA's interpretation of public water supply as publicly owned and operated, as opposed to privately and commercially owned and operated, is also supported by other provisions of the ZBL. Retail trade, including sales and restaurants, is not allowed in the four residential districts. App. Ex. 2. The Water Company, with its retail sales of water, will not be allowed in the four residential districts as of right under the interpretation adopted by the ZBA. Moreover, as the ZBA argues, in the two instances where the word "public" is used in the ZBL ("public water supply use" and "public or non-profit library, museum, art gallery or civic center"), it is in the sense adopted by the ZBA here: publicly owned and non-commercial. 





 BCW also argues that, because it makes its product, spring water, available to the general public, it is a "public water supply." By that definition, any purveyor of products to the general public is "public," which has implications for "public" museums and art galleries allowed as of right in residence districts. A private, commercially operated art gallery, open to the public, could, under BCW's interpretation, contend that it is allowable as of right in residential districts under B.3. of the Table of Use Regulations (allowing "Public or nonprofit library, museum, art gallery or civic center" as of right in all districts except the elderly housing district, where the use is allowed by special permit) as opposed to being barred from all save three business districts under D.1. of the Table of Use Regulations as a "general retail" use. 





 Finally, to read the ZBL as BCW does here-to require that transient non-community water systems be treated as public water systems, and thus allowable as of right in every zoning district in the Town except the elderly housing district-would affect not just the Water Company, but also other transient non-community water systems, such as the restaurants, motels, campgrounds, parks, golf courses, ski areas and community centers cited as examples of transient non-community water systems in the DEP's regulations. See 310 Code Mass. Regs. § 22.02. Under the ZBL's Table of Use Regulations, restaurants are only allowed in business districts, golf courses (whether municipal or commercial) are only allowed by special permit in certain districts and are not allowed in others, [Note 4] and motels are not an allowed use in any district. The one other transient non-community water system in the Town-the Sagamore Spring Golf Club, Inc.-would, under BCW's interpretation, be similarly allowed as of right throughout the Town. BCW's interpretation, which, in contrast to the interpretation adopted by the ZBA, would wreak havoc with the Town's Table of Use Regulations, is unreasonable. 





Conclusion 





 For the foregoing reasons, the Motion is ALLOWED. O'Brien v. Shaffer, 19 MISC 000071 (JSDR) and Boston Clear Water Company, LLC v. Shaffer, 19 MISC 000254 (JSDR) are SEVERED. Judgment shall enter in Boston Clear Water Company, LLC v. Shaffer, 19 MISC 000254 (JSDR), upholding the decision of the ZBA insofar as it interpreted the term "public water supply" in the ZBL to mean a water system operated by a public sector entity and dismissing the action with prejudice. 





 SO ORDERED 





FOOTNOTES
[Note 1] G. L. c. 94, § 10A, entitled "Bottling - Permits Required," states that "[n]o person shall engage within the commonwealth in the business of manufacturing or bottling carbonated non-alcoholic beverages or water, both carbonated and noncarbonated, for human consumption without a permit to do so from the board of health of the town wherein such plant is, or is to be, located, and no person engaged without the commonwealth in said business shall sell any such beverage within the commonwealth without a permit from the state department of public health, and no person shall sell or exchange, deliver, advertise or offer for sale or exchange, or attempt to deliver, or have in his possession with intent to do so, any such beverage unless the manufacturer and bottler thereof is the holder of a permit issued under the authority of section ten B and then in full force." 



 G. L. c. 94, § 10B, entitled "Bottling - Who May Grant Permits; Expiration; Fees," states that "[l]ocal boards of health may grant permits to engage within their respective municipalities in the business of manufacturing or bottling of beverages specified in the preceding section[.] . . . Each permit granted under this section shall expire one year from the date of its issue."



[Note 2] BCW also cites to statutes that it contends delegate authority to the DEP over municipal and private water supplies: G. L. c. 111, §§ 2C, 5E, 5F, 5G, 17, 159, 160, 160B, 162, 165; G. L. c. 40, § 41A; G. L. c. 114, § 35; G. L. c. 140, § 32B and G. L. c. 165, § 4B. BCW does not, however, explain how the ZBA's interpretation of the ZBL here frustrates the purpose of any of these statutes. They are not considered further. 

[Note 3] See also, e.g., 310 Code Mass. Regs. § 22.21(1)(d) ("No public water supply well, wellfield or spring designed to withdraw, or spring which flows, 100,000 gallons per day or more shall be placed on-line unless ... 2. the cities and towns in which any part of the Zone II of the proposed well, wellfield, or spring is located have wellhead protection zoning or nonzoning controls in effect that prohibit siting within the Zone II the land uses set forth in 310 CMR 22.21(2)(a) and (b) ..."); 310 Code Mass. Regs. § 22.21(1)(f) ("Notwithstanding any other regulatory provision to the contrary, the Department may waive the requirement that the proponent of a public water supply well, wellfield, or spring delineate the Zone II, provided ... 2. each city and town in which the Zone III of the proposed well, wellfield, or spring is located has wellhead protection zoning or nonzoning controls in effect that prohibit within the Zone III the land uses set forth in 310 CMR 22.21(2)(a) and (b)..."); 310 Code Mass. Regs. §22.20C(2) ("...Surface water protection zoning and nonzoning controls submitted to the Department in accordance with 310 CMR 22.20C(1) shall collectively prohibit the siting of the following new land uses within Zone A: ..."). 

[Note 4] While golf courses are allowed by right in the Municipal District, they must be "[m]unicipally owned or operated" to qualify as a by right use. App. Ex. 2. 


 
 Home/Search 
 Land Cases by Docket Number
 Land Cases by Date 
 Land Cases by Name
 


 Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.